## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| LEJILEX; CRYPTO FREEDOM ALLIANCE OF TEXAS, <br><br> *Plaintiffs*, <br><br> v. <br><br> SECURITIES AND EXCHANGE COMMISSION; ERIC R. WERNER; GARY GENSLER; CAROLINE A. CRENSHAW; JAIME E. LIZÁRRAGA; HESTER M. PEIRCE; and MARK T. UYEDA, in their official capacities, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. _____ |

## COMPLAINT

1.      Over the past two years, the Securities and Exchange Commission ("SEC") has brought a series of increasingly aggressive enforcement actions in service of a campaign of gross regulatory overreach.  Although multiple SEC Commissioners have recognized for years that Congress has not provided the SEC with broad authority to regulate digital assets—and although Congress has considered dozens of often bipartisan bills related to digital asset regulation in recent years but enacted none of them—the SEC's recent enforcement actions embrace the novel position that nearly all digital asset transactions involve "investment contracts" under the federal securities laws, bringing those transactions and the

platforms on which they occur within the SEC's regulatory domain.  That position threatens law-abiding participants in the digital asset industry with an imminent risk of being subjected to SEC enforcement actions for failing to comply with the SEC's exaggerated understanding of its own authority—even though that understanding fails as a matter of statutory text, history, precedent, and common sense, and would allow the SEC to unilaterally seize control over a trillion-dollar industry without anything like the clear statutory mandate necessary to justify such a massive expansion of agency power.

2.     The digital assets implicated here are just that—assets, not investment contracts.  They do not involve any kind of ongoing commitment on the part of the asset seller or developer to manage any common venture for the asset buyer's benefit.  Under the plain text of the federal securities laws, the well-settled meaning of the term "investment contract" when Congress enacted those laws, and binding Supreme Court precedent, the SEC does not have expansive power to regulate any and all transactions involving such digital assets as securities transactions.  The SEC's contrary view—that practically all digital asset transactions involve "investment contracts" under the federal securities laws, because (according to the SEC) the term "investment contract" reaches any asset a buyer purchases with the expectation that its value will increase based on the efforts of others—would give the agency the power to regulate not only practically all digital assets, but a

2

boundless array of other assets as well, from collectibles to luxury goods and beyond. Someone who purchases limited-run Nike sneakers intending to resell them, for example, may well expect to turn a profit based on Nike's managerial and promotional efforts to create demand for and otherwise increase the value of those desirable shoes. Under the SEC's newly minted view of its regulatory reach, that would apparently be enough to turn those sneakers into securities, their purchase into a securities transaction regulated by the SEC, and any auction house or consignment store that facilitates such purchases into an unregistered securities exchange. That sweeping claim of agency dominion reaches far beyond anything Congress authorized in any statute, and certainly reaches far beyond anything Congress authorized with the clarity that would be necessary to grant such extraordinary regulatory power.

3. The SEC's attempt to rewrite the longstanding interpretation of 90-year-old text to empower it to regulate a massive new industry without any grant of new statutory authority or change in the relevant statutory text also runs head-on into the major questions doctrine. In seeking to regulate the sale of nearly all digital assets on secondary markets, the SEC purports to locate newly discovered power in the words "investment contract," even though that term has never been understood to cover asset sales that do not involve any continuing obligations on the part of the asset creator or seller toward the purchaser. Worse still, the SEC's newfound

position would empower it to exercise authority that Congress has conspicuously declined to grant, and that Congress is actively considering assigning (at least in part) to a *different* agency.  Given those circumstances, there is no support for the proposition that Congress back in the 1930's conferred on the SEC regulatory authority over the entire digital asset industry—let alone over the myriad *other* commodities and assets that the SEC's sweeping approach would cover.  Absent the kind of "clear delegation" plainly lacking here, a "decision of such magnitude and consequence" on a matter of "earnest and profound debate across the country" must rest with Congress. *West Virginia v. EPA*, 597 U.S. 697, 732, 735 (2022).

4.     The SEC's regulatory strategy for asserting its novel and expansive view of its authority only compounds the problem.  Despite repeated pleas from industry participants, the SEC has refrained from issuing any explicit regulation setting forth its new position, which would require the agency to subject its reasoning to the crucible of notice-and-comment rulemaking (and ultimately judicial review) and would give parties clear notice of exactly what the SEC believes falls within its regulatory domain.  Instead, the SEC has chosen to proceed through a series of *ad hoc* enforcement actions—often against trading platforms or secondary market participants rather than against digital asset creators themselves—in which the agency has charged defendant after defendant with violating the securities laws through their involvement in digital asset transactions, all while refusing to provide

4

any definitive regulation that would afford industry participants clear *ex ante* guidance (and a clear target for judicial review). That approach has left this trillion-dollar industry in an unsustainable state of uncertainty, subject to the arbitrary enforcement whims of an agency with an overly broad view of its own authority.

5.    Plaintiffs are a company that wishes to launch a new digital asset trading platform and a nonprofit association advocating for sensible digital asset regulation. They bring this suit to prevent the SEC from unlawfully charging them and their members with violating the securities laws based on the SEC's fundamentally mistaken view of its regulatory power, and to end the SEC's efforts to unlawfully extend its regulatory authority to cover nearly all digital assets. In particular, Plaintiffs seek declaratory and injunctive relief to ensure that Plaintiff LEJILEX, whose new platform will enable secondary sales of certain digital assets, does not have to register with the SEC as a securities exchange, broker, or clearing agency—contrary to the SEC's view, as expressed in the multiple enforcement actions that the SEC has brought against comparable digital asset trading platforms. This Court should grant Plaintiffs the relief they request and free them and the rest of the digital asset industry from the imminent threat of unlawful SEC enforcement actions based on the SEC's unsustainable view of its regulatory authority.

## JURISDICTION AND VENUE

6.    The Court has subject-matter jurisdiction under 28 U.S.C. §1331.

5

7.     Venue is proper in this district because Defendant Eric R. Werner, who is the Regional Director of the Fort Worth Regional Office of the SEC, resides in this district at 801 Cherry Street, Suite 1900, Unit 18, Fort Worth, TX 76102.  *See* 28 U.S.C. §1391(e)(1)(A) (venue in actions against a federal officer or agency is proper "in any judicial district in which … a defendant in the action resides").

8.     Venue is also proper in this district because Plaintiff LEJILEX maintains its principal place of business in this district at 5049 Edwards Ranch Road, Suite 400, Fort Worth, TX 76107, and no real property is involved in this action.  *See* 28 U.S.C. §1391(e)(1)(C) (venue in actions against a federal officer or agency is proper "in any judicial district in which … the plaintiff resides if no real property is involved in the action"); *see also id.* §1391(c)(2) ("[A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside … if a plaintiff, only in the judicial district in which it maintains its principal place of business[.]").

9.     In addition, venue is proper in this district because Plaintiff Crypto Freedom Alliance of Texas maintains its principal place of business in this district, with its mailing address at 5601 Bridge Street, Suite 300, Fort Worth, Texas, 76112, and no real property is involved in this action.  *See* 28 U.S.C. §1391(c)(2), (e)(1)(C).

**PARTIES**

10.    Plaintiff LEJILEX is a domestic for-profit corporation incorporated under Texas law that has developed a novel digital asset platform called the Legit.Exchange.  The Legit.Exchange is a non-custodial digital asset trading platform that allows users to trade digital assets with each other through the use of underlying smart contracts.  Those trades will occur through blind bid/ask transactions, meaning that buyers and sellers will never know who is on the other side of any trade.  LEJILEX itself will never take custody of customer assets, but will retain control over which digital assets can be traded on the platform and will handle administrative functions like user verification, while charging a commission on trades made through the platform.  This design is intended to provide users the benefits that are associated with non-custodial smart contracts while ensuring that LEJILEX can maintain the service level, technical security, and compliance checks that larger financial entities may require of a digital asset trading platform.

11.    Plaintiff Crypto Freedom Alliance of Texas ("CFAT") is a non-profit membership organization whose members include LEJILEX.  CFAT advocates for the responsible development of digital asset policies in Texas to foster innovation and economic growth while protecting consumers.  CFAT believes that blockchain technology will pave the way for the next generation of the internet, and that Texas should play a leading role in developing appropriate and workable digital asset

policies.

12.     Defendant SEC is an agency of the federal government headquartered at 100 F Street, NE, Washington, DC 20549.  The SEC is charged with enforcing the federal securities laws, including the Securities Act of 1933, 15 U.S.C. §77a *et seq.* ("Securities Act"), and the Exchange Act of 1934, 15 U.S.C. §78a *et seq.* ("Exchange Act").

13.     Defendant Eric R. Werner is the Regional Director of the Fort Worth Regional Office of the SEC, which has jurisdiction in Texas, Oklahoma, Arkansas, and Kansas.  He is sued in his official capacity.

14.     Defendant Gary Gensler is Chair of the SEC.  He is sued in his official capacity.

15.     Defendant Caroline A. Crenshaw is a Commissioner of the SEC.  She is sued in her official capacity.

16.     Defendant Jaime E. Lizárraga is a Commissioner of the SEC.  He is sued in his official capacity.

17.     Defendant Hester M. Peirce is a Commissioner of the SEC.  She is sued in her official capacity.

18.     Defendant Mark T. Uyeda is a Commissioner of the SEC.  He is sued in his official capacity.

## NATURE OF THE ACTION

### A.     The Securities Act and the Exchange Act

19.     The Securities Act and the Exchange Act authorize the SEC to regulate transactions involving "securities," a term statutorily defined by a long list of various categories of financial instruments:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. §77b(a)(1); *see* 15 U.S.C. §78c(a)(10) (similar).

20.     While that list is extensive, it does not purport to include anything and everything one might obtain as an "investment" in the colloquial sense, or even everything traded by investors on markets.  For instance, it does not include commodities—i.e., things like gold, wheat, sugar, or oil—even though they are traded by sophisticated investors on markets all throughout the country.  Instead, to the extent Congress has imposed some restrictions in the commodities trading

context, it has allocated enforcement of those restrictions to other agencies, first the U.S. Department of Agriculture's Commodity Exchange Authority and later the Commodity Futures Trading Commission ("CFTC").  Likewise, in its original form, the definition of "securities" did not include any currency—i.e., things like the U.S. dollar—even though currency trading is older than our Republic.  Congress had to amend the statute in 1982 when it decided that it wanted to empower the SEC to regulate certain instruments traded on "exchange[s] relating to foreign currency." *Id.* §78c(a)(10); *see* Pub. L. No. 97-303, §2, 96 Stat. 1409 (1982).

21.    The common feature among the instruments included in the definition of "securities" thus is not that people may purchase them hoping to turn a profit, but that they all involve some sort of *ongoing relationship* between the purchaser and the issuer or seller.  Broadly speaking, the purchaser agrees to invest its capital into an enterprise in exchange for a stake in the enterprise, and the issuer or seller agrees in return to manage the enterprise's affairs to benefit its investors.  For instance, purchasing a "stock" entitles the purchaser both to a share in the company and to a commitment that the company's management will endeavor to maximize shareholder value.  So too with a "bond," or a "note," or "participation in any profit-sharing agreement"; those investments are backed by a forward-looking commitment to manage the common enterprise to ensure whatever form of return may be promised.  Those commitments and continuing obligations on the part of the

issuer or seller are typically embodied in written contracts, giving effect to the ongoing relationship of the parties.

22.     So too for "investment contracts," which are another of the enumerated categories of "security" in the Securities Act and the Exchange Act.  As the Supreme Court explained in its seminal decision addressing "investment contracts," that term does not encompass any and all transactions involving something one may purchase with the hope that it will increase in value.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).  It instead applies only when parties have entered into "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment,'" *id.* (quoting *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920))—that is, an ongoing relationship involving an investment into a common enterprise, with continuing obligations on the part of the issuer or seller to manage that enterprise for the benefit of its investors and share resulting profits.

23.     The facts of *Howey* are illustrative.  There, a Florida corporation sold buyers plots of land planted with orange trees along with a service contract to cultivate, harvest, and market the oranges.  328 U.S. at 295-96.  In return, the purchasers were entitled to a percentage of the net profits from the sale of the orange crop from the entire grove.  *Id.* at 296.  The Supreme Court concluded that this arrangement constituted an investment contract.  As the Court explained, neither "an

11

ordinary real estate sale" nor "an agreement by the seller to manage the property for the buyer" alone would constitute an "investment contract"—even if the purchaser may expect the land to prove profitable. *Id.* at 297-98. But the seller there was "offering something more than fee simple interests in land, something different from a farm or orchard coupled with management services." *Id.* at 299. It was "offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by" the seller. *Id.* That kind of arrangement, in which "[t]he investors provide the capital and share in the earnings and profits," and "the promoters manage, control and operate the enterprise" for the investors' benefit, is a classic investment contract "regardless of the legal terminology in which such contracts are clothed." *Id.* at 300.

24. Courts have applied that same understanding of the term "investment contract" ever since the early decisions interpreting the state "blue sky" laws from which Congress drew that term. *See id.* at 298. For instance, courts have found an investment contract in a sale of muskrats coupled with a contract for the seller to raise those muskrats on behalf of the buyer, sell the pelts, and pay the buyer a proportionate share of all proceeds from the muskrat-breeding operation. *State v. Robbins*, 240 N.W. 456, 457 (Minn. 1932); *see Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 468-71 (10th Cir. 1967) (similar case involving beavers). Likewise, courts have found an investment contract in a sale of land coupled with a contractual obligation

for the seller to harvest crops from that land for the buyer and divide any profits with the buyer. *See, e.g.*, *Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill.App. 331, 334-35 (1930); *Kerst v. Nelson*, 213 N.W. 904, 904-05 (Minn. 1927).

25.     In short, in keeping with the other terms in the definition of "security," "investment contract" encompasses only transactions that contemplate some form of common enterprise, with ongoing obligations on the part of the issuer or seller toward the buyer, such as the sale of an asset coupled with a contractual promise by the seller to develop that asset for the buyer's benefit and share with the buyer any profits it generates. That distinction makes sense, because by coupling the sale of an asset with an ongoing commitment to develop the asset for the buyer's benefit and share the resulting profits, an acre in an orange grove or a muskrat becomes little different from a share in an orange-growing company or a fur company. But without that coupling, an asset is just an asset, and a muskrat is just a muskrat.

26.     That fundamental difference accounts for the very different regulatory regimes governing securities versus commodities. Because investors in securities are investing in the common enterprise itself, they need information about the plans, views, and qualifications of those who will manage that enterprise. The securities laws thus impose substantial disclosure requirements on those who issue securities. 15 U.S.C. §77e(a), (c); *see SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010).

27.    No such disclosures apply, by contrast, to sellers of commodities, because a commodity purchase embodies no obligation on the seller's part to try to increase the commodity's value. *See* 7 U.S.C. §1a(9) (defining "commodity"). The CFTC's authority over spot trading in commodities markets is accordingly much more limited than the SEC's authority over securities markets: The CFTC may regulate only to prevent and penalize fraudulent and manipulative activities. *See* 7 U.S.C. §9; 17 C.F.R. §§180.1, 180.2.

28.    That long-settled understanding of the terms "security" and "investment contract" ensures that the SEC cannot insert itself into all walks of commercial life. After all, people purchase all manner of things with a reasonable expectation that future actions of the seller will cause them to increase in value. A person who purchases limited-run Nike sneakers, for example, may well expect to turn a profit based on Nike's managerial and promotional efforts to enhance the value of those coveted shoes. So too for a person who purchases a bottle of wine from a well-known winery, a luxury watch from a famed watch company, or a painting from a prominent artist. People routinely purchase things that they hope will increase in value owing at least in part to the reputation and efforts of those who produce them. If that alone rendered all such transactions "investment contracts," then the SEC's regulatory authority would be boundless.

14

### B.     The Digital Asset Industry

29.     Since its inception in 2008, the digital asset industry has grown exponentially, attracting ever more entrepreneurs and developers and powering a wide range of applications.  The industry is now valued at more than a trillion dollars, Navdeep Singh, *Crypto Price Today: Bitcoin Below $22,800; Crypto Market Cap Crosses $1 Trillion*, The Economic Times (Jan. 23, 2023), https://tinyurl.com/yc3uksvm; its daily trading volume is in the tens of billions of dollars, *2023 Q1 Crypto Industry Report*, CoinGecko (updated Oct. 16, 2023), https://tinyurl.com/3ptehpzm; and Bitcoin, the first and largest cryptocurrency, has a total value in circulation of some $450 billion, Federal Reserve Bank of NY, *The Financial Stability Implications of Digital Assets*, No. 1034, at 9 (Sep. 2022), https://tinyurl.com/5b2rkafh.

30.     Moreover, the impact of the digital asset industry reaches far beyond the combined value of digital assets.  Since the advent of Bitcoin in 2008, the industry has given rise to hundreds of thousands of new jobs, with programmers, engineers, and entrepreneurs pouring into the sector.  There are now dozens of major annual conferences on digital assets in the United States and around the world, practically every major law firm has a digital assets or blockchain practice, and practically every major bank is studying the uses of blockchain technology in the

financial sector. In short, as our economy moves increasingly in a digital direction, the future of the digital asset industry presents an issue of surpassing importance.

31. Digital assets are an application of blockchain technology. A blockchain is what is known as a distributed ledger, which is a database maintained by many computers that can record and verify data across the entire network. Innovators across the United States and around the world have adopted blockchain technology for a wide range of uses, including numerous non-financial uses such as identity verification, community governance, supply chain management, and records and data storage.

32. Digital assets, including those known as "cryptocurrencies," "crypto assets," and "tokens," are essentially computer code entries on blockchain technology that record the owner's right to access an application or service on a computer network. Each blockchain has its own "native" or "base" token—i.e., a digital currency designed to interact directly with the blockchain and ensure the proper function of the blockchain's protocol. The validity of the blockchain is generally maintained by the efforts of a distributed network of validators (for instance, by carrying out validating transactions or by staking tokens on the validity of a transaction record). Those users are then rewarded by the blockchain protocol with additional tokens for their efforts, creating a financial incentive to ensure the ongoing stability and accuracy of the blockchain.

33.     The first widely used digital asset, Bitcoin, debuted in 2008 and has since developed into an important international currency.   Bitcoin's blockchain-based network allows users to send and receive payments denominated in Bitcoin, its native token.  *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008), https://tinyurl.com/4536hnsv.  Another major digital asset network, Ethereum, was launched in 2015.   Ethereum likewise uses blockchain technology to facilitate transactions in its native token, Ether.  *What Is Ethereum?*, Ethereum Foundation, https://tinyurl.com/bdfk5f8y (last visited Feb. 16, 2024).  In the years since those platforms launched, thousands more digital assets have been developed, with a wide variety of functions and uses.  *Historical Snapshot – 12 November 2023*, CoinMarketCap, https://tinyurl.com/bdh4n3ds (last visited Feb. 16, 2024).

34.     Digital assets offer different kinds of utility to their owners.   Many supply a means to transfer funds or pay for products and services without an intermediary like a bank.  Payment tokens like these help provide access to financial services for the nearly 20% of American adults who have no or very limited access to banking.  *See* Bd. of Governors of the Fed. Rsrv. Sys., *Economic Well-Being of U.S. Households in 2021*, at 43-44 (May 2022), https://tinyurl.com/yr53p9f3; Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stanford Soc. Innovation Rev. (Nov. 24, 2021), https://tinyurl.com/4xhjrxpy.  Digital assets

also offer those with dependents living abroad a way to send cross-border remittance payments—a form of financial support relied upon by one billion people globally—at a significantly reduced cost. *See Crypto Could Help Save People in the US Billions of Dollars a Year in Remittance Fees*, Coinbase (Apr. 3, 2023), https://tinyurl.com/msj3mxjk.

35.    Unsurprisingly, given their ease and benefits of use, digital assets have quickly become ubiquitous.  Roughly one in every five Americans—more than 50 million people—has purchased a digital asset, *see, e.g.*, *New Survey of 2,000+ American Adults Suggests 20% Own Crypto and the Vast Majority See an Urgent Need to Update the Financial System*, Coinbase (Feb. 27, 2023), https://tinyurl.com/39h8w744, and more and more U.S. businesses now accept Bitcoin and other digital assets as payment for anything from groceries to airline tickets to real estate, *see The Use of Cryptocurrency in Business*, Deloitte (June 2023), https://tinyurl.com/yzw6xy5d; Jenna Hall, *Can You Buy A House With Bitcoin?*, Bitcoin Magazine (May 26, 2022), https://tinyurl.com/3w6vz2wp.   In addition, more than $25 billion in Bitcoin is held in exchange-traded funds, with some $1 billion of that amount coming in the two weeks after the recent SEC approval of NYSE, Nasdaq, and BZX proposals to list shares of trusts holding bitcoin. *See* Avik Roy, *The SEC's Bitcoin ETF Approvals Have Forever Altered the Global Monetary System*, Forbes (Jan. 24, 2024), http://tinyurl.com/yyj92pbf.

36.     Digital assets can also have utility linked to their specific networks. The token FIL, for example, can be used to buy computing storage space made accessible through its associated platform, the Filecoin Network.  Other tokens, like SOL, FLOW, and MATIC, can be used to pay transaction fees incurred when interacting with programs deployed on their respective networks.  Tokens with so-called "governance" attributes, such as AXS, can be used to cast votes for changes to a platform's code and thus its functionality.

37.     Once issued by its developer, a token can be traded on a secondary trading platform.  On secondary platforms, one customer's offer to buy or trade an asset at a particular price is matched with another customer's offer to sell or trade the asset at that price—the parties trade one digital asset for another digital asset or fiat currency.  The issuer of the token is not involved in a secondary transaction, and these transactions involve no additional promises, either between parties or by the creator of the asset.  Each transaction is simply a sale or trade of the token at issue, much as two parties might trade any other type of asset or commodity.

38.     As with any asset prone to market fluctuation, some people acquire digital assets in hopes that they can take advantage of these fluctuations in value to turn a profit.  People who do so, however, are not investing in the strict sense of becoming vested in a common enterprise, as digital assets do not typically convey any form of legal or equitable interest in any common enterprise, or any ongoing

19

obligation on the part of the creator (or anyone else) to manage any such enterprise for the benefit of those who choose to acquire those digital assets.  In fact, digital asset transactions typically entail no ongoing commitments or obligations of any kind.  They are just an exchange of the digital asset for something else of value.

39.     To be sure, it is certainly *possible* for a digital asset to involve ongoing obligations running from the asset's creator to those who purchase it; for instance, a business could create a digital asset that represents a traditional share of stock in that business, and that carries with it a contractual right to a share of the business's future profit.  Digital assets of that nature, however, are exceedingly rare.  And absent such rights and obligations, those who acquire digital assets in hopes of making a profit are simply relying on their own ability to predict whether and when the value of a particular digital asset may increase; they are not obtaining (let alone relying on) any commitment or obligation on the part of the asset creator or seller to manage any common enterprise for their benefit.  While purchasing an asset (whether digital or otherwise) in hopes that it will appreciate in value may be colloquially described as an "investment," such speculation on the rise or fall of asset prices is fundamentally different from an actual stake in an ongoing common enterprise.

**C.     The SEC's Initial Doubts That It Possesses Broad Authority to Regulate Digital Assets**

40.     As the foregoing makes clear, most digital assets are just that—assets, not shares in a common enterprise.  While there may be circumstances in which

those assets can be *part* of an investment contract in a broader enterprise, just as the sale of a muskrat can be part of an investment contract in a fur business when accompanied by a promise to raise that muskrat for fur and share the profits from its sale, those assets alone (like muskrats alone) are not investment contracts in and of themselves, and a sale of those assets alone is not a securities transaction.

41.     Given that dynamic, it should come as little surprise that the SEC initially claimed no authority to regulate digital assets sales, whether on secondary markets or otherwise.  Indeed, Bitcoin had been around for nearly a decade, and many other digital assets were in broad circulation, before the SEC even suggested that it might have regulatory authority over transactions involving digital assets.

42.     The SEC's first such suggestion came in the context of exploring whether the terms of an initial offering of a digital asset by its developer may render it an "investment contract" within the meaning of the Securities Act and the Exchange Act.  In 2017, the SEC issued a report on an investigation into an unincorporated organization called The DAO, which (according to the SEC) had sold DAO tokens in exchange for a stake in its plans to fund various projects using the money generated by those sales.  *See* SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), http://tinyurl.com/mrz4b8hw.  In the SEC's view, that initial offering qualified as an offer of "investment contracts," rendering The DAO an unregistered "issuer" of

securities.  *Id.* at 15-16.  The SEC further posited that secondary transactions The DAO facilitated in its tokens were investment contracts as well, rendering The DAO an unregistered securities exchange too.  *Id*. at 16.

43.    It was not entirely clear from that 2017 report just how broad a power the SEC was claiming.  But the following year, the Director of the SEC Division of Corporation Finance, Bill Hinman, indicated that it was relatively narrow. According to Hinman, while an initial offering of a digital asset may render it an "investment contract" (and hence a security) if its terms entitle the purchaser to a "financial interest in an enterprise," a digital asset "all by itself is not a security." William Hinman, Dir., SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), https://tinyurl.com/ymbbncnd.  Hinman further opined that neither of the two most prominent digital assets, Bitcoin and Ether, is a security, and that secondary market sales of those digital assets are not investment contracts.  *Id.*

44.    Hinman's understanding that digital assets standing alone are not securities was endorsed by then-SEC Chair Jay Clayton and other Commissioners. Jay Clayton, SEC Chair, *Remarks on Capital Formation at the Nashville 36|86 Entrepreneurship Festival* (Aug. 29, 2018), https://tinyurl.com/58wn8rz2; Hester Peirce, SEC Comm'r, *Regulation: A View from Inside the Machine*, Remarks at Missouri School of Law, Protecting the Public While Fostering Innovation &

Entrepreneurship (Feb. 8, 2019), https://tinyurl.com/2dmt2u47.  As a professor (before becoming SEC Chair), Defendant Gary Gensler likewise echoed Hinman's statements when he told his students that "3/4 of the [digital asset] market is non-securities.  It's just a commodity, a cash crypto."  Gary Gensler, MIT, Lecture Transcript: Blockchain and Money 11 (Fall 2018), https://tinyurl.com/3jpnxysn. And in May 2021, Gensler testified before Congress in his role as SEC Chair that "only Congress" could address the regulation of digital assets "because right now the exchanges trading in these crypto assets do not have a regulatory framework … at the SEC." *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 12 (2021) (statement of Gary Gensler, SEC Chair).

45.    At least one SEC Commissioner has continued to express a similarly narrow view of the SEC's power, explaining that if the agency "seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."  Hester M. Peirce, SEC Comm'r, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/2p8z7f2r; *see also Risley v. Univ. Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y. Aug. 29, 2023) ("Congress and the courts have yet to make

a definitive determination as to whether [digital assets] constitute securities, commodities, or something else.").

### D. The SEC's Campaign to Expand Its Regulatory Authority Via Enforcement

46. Notwithstanding those public statements acknowledging limitations on and doubts about its power to regulate digital asset transactions, the SEC's regulatory strategy has shifted markedly over the past few years. In August 2021, Gensler vowed to "take [the SEC's] authorities as far as they go" in pursuit of regulating digital asset trading platforms. Letter from Gary Gensler, SEC Chair, to Sen. Elizabeth Warren (Aug. 5, 2021), https://tinyurl.com/4c9tfn3t. The SEC did not proceed, however, with a notice-and-comment rulemaking to establish rules with which digital asset creators or trading platforms must comply on a prospective basis—an endeavor that would have forced the agency to consider the views of the industry it seeks to regulate, provide clear notice of any new rules of the road, and defend any such rules against judicial challenge. Instead, the SEC began trying to expand its regulatory domain through a series of aggressive and unorthodox enforcement actions claiming that digital asset creators and trading platforms had violated rules that the SEC has never established, by failing to comply with a registration and disclosure regime that does not currently exist for digital assets, based on expansive legal theories that the agency had previously disavowed.

47.    To that end, over the following months, the SEC doubled the size of its digital asset enforcement unit and began increasing its investigations of participants in the digital asset market.  Press Release, SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://tinyurl.com/w8aap5cn; *see, e.g.*, Press Release, *SEC Charges Poloniex for Operating Unregistered Digital Asset Exchange* (Aug. 9, 2021), http://tinyurl.com/wuyau6ne (reporting $10 million settlement of administrative charges against Poloniex for operating a digital assets platform without registering it as a securities exchange).  The SEC proceeded to bring a lawsuit in 2022 advancing the view that Coinbase, a prominent digital asset platform, is an unregistered securities exchange.  The SEC did so, however, not by suing Coinbase or the creators of the digital assets that the SEC claimed were securities.  Instead, the SEC brought an enforcement action against a 32-year-old former Coinbase employee and his brother, alleging that they had engaged in "securities" fraud by misappropriating Coinbase's confidential information to front-run purchases of certain digital assets traded on Coinbase's platform.  Complaint, *SEC v. Wahi*, No. 2:22-cv-01009-TL (W.D. Wash. filed July 21, 2022), Dkt.1.

48.    Notably, while the United States brought a parallel criminal action against the same individuals, it did not allege that the digital assets at issue were securities.  *See United States* v. *Wahi*, No. 1:22-cr-00392-LAP (S.D.N.Y. July 19,

2022).   But the SEC did—thus producing the oddity of a suit in which Coinbase itself was not a party able to defend against the allegation that it was unlawfully operating as an unregistered securities exchange, and the digital asset creators were not parties able to contest the characterization of those assets as securities.   *Cf.* Caroline D. Pham, CFTC Comm'r, *Statement on SEC v. Wahi* (July 21, 2022), http://tinyurl.com/ytny6a9w (criticizing that suit as "a striking example of 'regulation by enforcement'"). Confronted with a host of amicus briefs explaining that it was exceeding its statutory authority, the SEC summarily ended its suit in a settlement that involved neither the payment of any money nor any admission of liability.  *See* Final Judgment, *SEC* v. *Wahi*, No. 2:22-cv-01009-TL (W.D. Wash. filed June 1, 2023), Dkt.109.

49.     The SEC soon followed *Wahi* with a slew of other enforcement actions, largely against smaller-scale or unsympathetic defendants, seeking to expand its regulatory authority over digital assets by imposing retrospective liability on industry participants.  *See* SEC, *Crypto Assets and Cyber Enforcement Actions*, http://tinyurl.com/nvyzb3e7 (last visited Feb. 16, 2024) (listing SEC digital asset enforcement actions).  And though nothing in the law had changed since Gensler and others had indicated otherwise over the previous several years, by December 2022, Gensler was claiming that "we have enough authority … in this space" to fully regulate digital asset trading platforms.  Jennifer M. Schonberger, *SEC's Gensler:*

*The 'Runway Is Getting Shorter' for Non-compliant Crypto Firms*, Yahoo! Fin. (Dec. 7, 2022), http://tinyurl.com/4rwe2k8p.  He thus insisted that digital asset platforms must "come in, talk to us, and register" with the SEC or face the risk of an enforcement action, Gary Gensler, SEC Chair, *Kennedy and Crypto* (Sept. 8, 2022), https://tinyurl.com/595n6xjz—even though the SEC had not (and, to this day, still has not) promulgated any rules or regulations establishing how digital asset platforms should register or explaining what else the SECs thinks they must do to comply with the securities laws.

50.     As one SEC Commissioner observed, "[u]sing enforcement actions to tell people what the law is in an emerging industry" is not a "fair way of regulating," as "one-off enforcement actions and cookie-cutter analysis does not cut it" when it comes to providing fair notice of what the law requires.  Hester Peirce, SEC Comm'r, *Kraken Down*: *Statement on* SEC v. Payward Ventures, Inc., et al. (Feb. 9, 2023), https://tinyurl.com/2mwnuppr; *see also* Hester Peirce, SEC Comm'r, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), http://tinyurl.com/42wp6ptz ("The application of the securities laws to token projects is not clear, despite the Commission's continuous protestations to the contrary.  There is no path for a company like LBRY to come in and register its functional token offering. … The time and resources we expended on this case could have been devoted to building a workable regulatory framework that companies like LBRY could have followed.");

27

Pham, *supra* (emphasizing that digital assets regulation should be "addressed through a transparent process that engages the public to develop appropriate policy with expert input—through notice-and-comment rulemaking," because "[r]egulatory clarity comes from being out in the open, not in the dark").

51.    The SEC has nevertheless refused to propose for public comment any regulations setting forth its view on what purportedly brings a digital asset within its regulatory domain—and in fact explicitly denied a recent petition for rulemaking imploring the agency to do so.  *See* Letter from Vanessa Countryman, Secretary, SEC, to Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. (Dec. 15, 2023), *available at* http://tinyurl.com/4ezj2wa2; *see also* Gary Gensler, SEC Chair, *Statement on the Denial of a Rulemaking Petition Submitted on Behalf of Coinbase Global, Inc.* (Dec. 15, 2023), http://tinyurl.com/3w7z9xfp; *but see* Hester M. Peirce and Mark T. Uyeda, SEC Comm'rs, *Statement Regarding Denial of Petition for Rulemaking* (Dec. 15, 2023), *available at* http://tinyurl.com/5cy5ux3w (dissenting from denial of petition because "addressing these important issues is a core part of being a responsible regulator").  Instead, the SEC has continued to sue participant after participant in the digital asset industry, faulting them for failing to comply with requirements the agency itself previously indicated do not apply.  *See, e.g.*, Press Release, *SEC Charges Crypto Asset Trading Platform Bittrex and Its Former CEO for Operating an Unregistered Exchange, Broker, and Clearing Agency* (Apr. 17,

2023), http://tinyurl.com/bdh849ta (announcing a suit against digital asset platform Bittrex).

52.     In June 2023, the SEC stepped things up yet another notch, bringing enforcement actions against Coinbase and Binance, two of the largest platforms that facilitate secondary-market sales of digital assets, on the theory that they are unregistered securities exchanges, brokers, and clearing agencies. *See* Complaint, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023) ("Coinbase Complaint"); Complaint, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023) ("Binance Complaint").   In the Coinbase case, the SEC has asserted that 12 tokens Coinbase listed for trading on Coinbase (or available for trading on decentralized exchanges through Coinbase's Wallet application) are securities, and that any sale of those assets (including secondary-market sales like those made using Coinbase or its Wallet application) is a securities transaction covered by the federal securities laws.

53.     The digital assets that the SEC has targeted in the Coinbase suit include SOL, the native token of the Solana blockchain; ADA, the native token of the Cardano blockchain; MATIC, the native token of the Polygon blockchain; FIL, the native token of the Filecoin network; SAND, a token created on the Ethereum blockchain that is the native token of the Sandbox platform; AXS, or "Axie Infinity Shards," Ethereum tokens that are native to the Axie Infinity game; CHZ, a token on

the Ethereum blockchain that is the native digital token for a sports fan engagement platform, Chiliz; FLOW, the native token for the Flow blockchain; ICP, the native token of the "Internet Computer Protocol"; NEAR, the native blockchain of the NEAR blockchain protocol; VGX, the native token of the digital asset platform known as Voyager; DASH, the native token of the Dash blockchain and the token used for financial transactions on the Dash platform; and NEXO, the native or "exchange" token for the Nexo platform, a digital asset trading and lending platform. *See* Coinbase Complaint ¶¶114, 119, 127-305.

54.   As these descriptions suggest—and as the SEC itself documented— those tokens are wildly diverse, differing in everything from how and why they were created to how they were initially offered to how they are used to how they work as a technical matter and more.  *See id.* ¶¶127-305.  Practically the only thing they have in common is that they are all digital assets that were sold on the secondary market using the Coinbase platform or its Wallet application.[1]  Yet in the SEC's view, each and every purchase or sale of those tokens is an "investment contract." *See id*. ¶6.

55.   According to the SEC, moreover, by allowing its users to sell those tokens on the secondary market through its platform, "Coinbase has operated as: an

---

[1] Those assets also apparently happened to be the first twelve digital assets listed on a screenshot of Coinbase's trading page—underscoring the apparent arbitrariness of the SEC's selections.  *See* David Canellis, *Did the SEC Just Label Everything on Coinbase's Front Page a Security?* (June 7, 2023), http://tinyurl.com/3vu277ed.

unregistered broker," "an unregistered exchange," and an unregistered clearing agency, in violation of 15 U.S.C. §§78e, 78o(a), and 78q-1(b)(1).  Coinbase Complaint ¶3; *see id*. ¶¶8, 25-38, 306-08, 372-380.  The complaint also alleges that Coinbase operated as an unregistered broker by offering its Wallet application, which allows users to keep digital assets in their own custody and trade them through decentralized third-party platforms, rather than keeping them in Coinbase's custody and trading them on Coinbase's own platform.  *See id.* ¶¶4, 64, 307.

56.    The SEC's complaint against Binance is much the same.  It alleges that Binance facilitated secondary-market sales of the SOL, ADA, MATIC, FIL, SAND, and AXS tokens at issue in the Coinbase Complaint, as well as four others:  ATOM, the native digital asset of the Cosmos Hub; MANA, a digital token minted by Decentraland; ALGO, the native token of the Algorand blockchain; and COTI, the native token of the Coti blockchain and ecosystem.  Binance Complaint ¶¶352-509.[2] According to the SEC, by allowing these tokens to be sold on its platform, Binance "unlawfully offered three essential securities market functions—exchange, broker-dealer, and clearing agency—on the Binance Platforms without registering with the SEC."  *Id*. ¶3; *see id*. at ¶¶14-15.

57.    The SEC's campaign has since continued unabated.  On November 20,

---

[2] The Binance Complaint also alleges that two tokens issued by Binance, BNB and BUSD, are securities.  *See id*. ¶¶287-324.

2023, the agency filed a similar complaint against Payward, Inc. and Payward Ventures, Inc., doing business collectively as Kraken.  *See* Complaint, *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. filed Nov. 20, 2023) ("Kraken Complaint").  As with Coinbase and Binance, the SEC alleged that, by operating a digital assets trading platform, Kraken had "acted as a broker, dealer, exchange, and clearing agency" with respect to the digital assets traded on its platform, "many of which form the basis of investment contracts covered under U.S. securities laws." *Id.* ¶1.  In particular, the SEC claimed that the SOL, ADA, FIL, FLOW, ICP, MATIC, and NEAR tokens from the Coinbase complaint and the ALGO, ATOM, and MANA tokens from the Binance complaint, as well as OMG, the native token of the OMG network, were all offered and sold as investment contracts.  *Id.* ¶¶59-62.

### E.    The Threat Plaintiffs Now Face From the SEC

58.    Plaintiff LEJILEX is a Texas corporation that is developing a new digital asset trading platform called the Legit.Exchange.  The Legit.Exchange will be a secondary trading platform.  In other words, LEJILEX will not be developing or issuing any digital assets or facilitating issuances of digital assets by others; its trading platform will only allow users to trade already-issued digital assets in peer-to-peer secondary transactions.  Those transactions will be structured as blind bid/ask trades, meaning buyers and sellers will not know who is on the other side of a transaction.

32

59.    The Legit.Exchange will be a "non-custodial" trading platform, meaning LEJILEX will never have custody of any digital assets traded on the platform.  Nor will LEJILEX be making any contractual or other commitments to its users to provide any managerial services with respect to any digital assets that may be exchanged on its platform.  The Legit.Exchange will simply be dedicated to facilitating peer-to-peer secondary transactions in already-existing tokens that LEJILEX approves for trading, with LEJILEX taking a commission on those transactions.  LEJILEX will approve trading, moreover, only in digital assets that do not embody rights to participation in common enterprise; it will not permit trading in any of the rare digital assets that are structured akin to a traditional share or stock and carry with them an ongoing commitment on the part of the asset seller or developer (or a third party) to manage a common venture for the asset buyer's benefit.

60.    LEJILEX has taken significant steps to prepare for its launch of the Legit.Exchange, including developing code, a user interface, and a website for the Legit.Exchange, engaging service providers and contractors to host, design, and develop the site and product features, and raising funds for the Legit.Exchange's operation—and of course, engaging in regulatory due diligence.

61.    LEJILEX does not believe that the SEC has regulatory authority over the secondary transactions in digital assets that will occur on the Legit.Exchange, so

it does not intend to register as a securities exchange, broker, or clearing agency with the SEC.  Nor could LEJILEX do so even if it wanted to, because the SEC has not promulgated any regulations providing for the registration of digital asset platforms like the Legit.Exchange.  But LEJILEX plans to permit trading on the Legit.Exchange of digital assets that the SEC has elsewhere claimed are "securities," such as MANA, POWR, RGT, RLY, SAND, DASH, and XYO.

62.    LEJILEX therefore faces a genuine threat that, when the Legit.Exchange launches, the SEC will bring an enforcement action claiming that LEJILEX is operating an unregistered securities exchange, broker, or clearing agency, just as the SEC has recently done to other digital asset platforms (including Bittrex, Coinbase, Binance, and Kraken) that facilitate secondary transactions in the same digital assets that LEJILEX will allow on the Legit.Exchange.  *See* Gary Gensler, SEC Chair, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products* (Jan. 10, 2024), http://tinyurl.com/4jmzwy3d (asserting that "for the most part," digital assets trading platforms "are non-compliant with the federal securities laws").

63.    LEJILEX is also a member of Plaintiff CFAT, a non-profit organization that advocates for the responsible development of digital asset policies in Texas.  CFAT is negatively affected twice over by the SEC's ongoing campaign of regulatory overreach.  First, it has members (including LEJILEX) who face a clear

and imminent threat of unlawful SEC enforcement actions for their existing or intended activities. Second, the SEC's capacious view of its own authority hinders CFAT from pursuing its mission of advocating for the responsible development of digital asset policies in Texas to foster innovation and economic growth while protecting consumers. By asserting broad dominion over the digital asset industry, the SEC impedes the ability of other authorities whose jurisdiction may *properly* extend to digital assets to enter the field, making it harder for CFAT to convince Texas policymakers to develop and adopt the sensible policies that the Texas digital asset industry needs.

### F.   The Fatal Flaws in the SEC's Regulatory Landgrab

64.    The SEC's novel attempt to extend its regulatory power to virtually all digital assets reaches far beyond the scope of its statutory authority. Outside of rare circumstances not at issue here, digital assets are just that: standalone assets that do not constitute "investment contracts," and so are not inherently subject to SEC regulation under the Securities Act and the Exchange Act. For much the same reasons, mere sales and purchases of those assets on secondary markets likewise fall outside the SEC's jurisdiction. The SEC's contrary view, which would grant it sweeping authority to regulate not only the trillion-dollar digital asset industry but practically any transaction involving an asset that a buyer might view as an investment, cannot be squared with basic principles of statutory interpretation.

### 1. The SEC's expansive view of its regulatory authority defies text, history, precedent, and common sense.

65.    The SEC insists that nearly all transactions in digital assets are "investment contracts," and hence "securities" subject to SEC regulation. *See, e.g.*, Coinbase Complaint ¶102 (claiming that digital assets traded on Coinbase "are offered and sold as investment contracts, and thus as securities"); Binance Complaint ¶352 (same); *see also* Gary Gensler, SEC Chair, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products* (Jan. 10, 2024), http://tinyurl.com/4jmzwy3d ("[T]he vast majority of crypto assets are investment contracts and thus subject to the federal securities laws.").  But that sweeping claim contravenes text, history, precedent, and common sense.

66.    As the Supreme Court made clear long ago, whether something qualifies as an "investment contract" depends on whether it entails "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'"  *Howey*, 328 U.S. at 298 (quoting *Gopher Tire*, 177 N.W. at 938).  In other words, the irreducible minimum of an "investment contract" is an arrangement involving an exchange of capital for some ongoing stake in the common enterprise into which the investor is becoming vested, with a corresponding obligation on the issuer or seller to manage that enterprise for the investor's benefit and share resulting profits.  *Id.* at 298-300.

36

67.     Applying those principles, the SEC itself has long recognized that sales of commodities and other assets are not sales of securities—even when purchased in hope of appreciation—if the seller undertakes no post-sale obligations to the buyer. *See, e.g.*, *Am. Diamond Co.*, SEC No-Action Letter, 1977 WL 10907, at *4-5 (Aug. 15, 1977) (taking no action where seller intended to advertise "diamonds as an investment" but had no obligation to provide further services); *Future Sys. Inc.*, SEC No-Action Letter, 1973 WL 9653, at *3 (June 8, 1973) (taking no action on sales of silver where seller stored the silver but "would have no other relationship with the purchaser after the initial sale").  Indeed, even the SEC's proffered definition of an "investment contract" in *Howey* required an ongoing "contractual arrangement," not just an asset sale.  Br. for SEC, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946) (describing the "definition of an 'investment contract' … as including any *contractual arrangement* for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters" (emphasis added)).

68.     That long-settled law dooms any claim that practically all digital assets transactions are "investment contracts," as the typical digital asset does not carry with it any obligation by its creator or seller to manage a common enterprise for the benefit of whoever holds it.  Just like land, muskrats, or diamonds, they are assets, not "investment contracts."  *See, e.g.*, *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900,

at *7-8 (S.D.N.Y. July 13, 2023) ("XRP, as a digital token, is not in and of itself a 'contract, transaction, or scheme' that embodies the *Howey* requirements of an investment contract." (brackets omitted)); *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *12 (S.D.N.Y. July 31, 2023) ("[m]uch as the orange groves in *Howey* would not be considered securities if they were sold apart from the cultivator's promise to share any profits derived by their cultivation," the tokens at issue "when considered in isolation, might not then have been, by themselves, investment contracts").

69.    To be sure, as with more traditional assets like orange-grove lots and muskrats, it is *possible* to create a contractual arrangement in which a digital asset represents a stake in the enterprise that created it and carries with it an obligation on the part of its creator to manage that enterprise for the asset owner's benefit and share resulting profits. But the vast majority of digital assets (and, more importantly, *all* the digital assets LEJILEX will list) are simply standalone assets that do not represent any such interest or embody any such obligation. As such, neither they nor transactions in them are "investment contracts."

70.    That is so regardless of whether people may purchase digital assets with the hope or even expectation that they will increase in value. People routinely purchase assets with the hope that they will grow in value based on the creator's entrepreneurial or managerial efforts. Someone who buys a Rolex watch may expect

to turn a profit based on Rolex's efforts to build and maintain its brand, just as someone who buys a rare baseball card may expect to sell it at a profit based on The Topps Company's efforts to regulate the supply of a product that trades at many multiples of its release price. But no ordinary English speaker would call such transactions "investment contracts."

71.    That is because they lack the *sine qua non* of an investment contract: a continuing obligation by the seller or a third party to manage a common enterprise for the purchaser's benefit. The price of such commodities is instead driven by the market forces of supply and demand, with supply controlled by the commodity producers and demand potentially influenced by their marketing efforts. Market participants who choose to speculate on such commodities in hopes of financial gain anticipate that those forces will ultimately benefit their positions based on the changing price *of the commodity*, not based on whether the commodity *producers* themselves are profitable. That is the difference between buying a bar of gold and buying a share in a gold company. And that is why the purchase of a digital asset is not an "investment contract," regardless of what the buyer may hope or expect.

72.    That is even more obvious when it comes to secondary transactions in digital assets on platforms like the Legit.Exchange. Those secondary-market transactions simply transfer ownership of a digital asset from one party to another. They do not even involve the asset creator, let alone entail any ongoing obligation

by the creator (or anyone else) to manage any common enterprise for the secondary-market buyer's benefit.  The buyer does not acquire any right either to any future profits or to any efforts to manage anything for his benefit; he acquires only the digital asset itself.  And the price that the buyer pays for the asset goes to the asset seller, not its creator—because it is consideration for the digital asset, not an investment in some broader common enterprise.  *See Ripple Labs, Inc.*, 2023 WL 4507900, at *11-12 (recognizing that "the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all," and they "could not reasonably expect" that the money the spent purchasing such assets on the secondary market would be used "to improve the XRP ecosystem and thereby increase the price of XRP").

73.   Moreover, just as with any other commodity transaction, the digital asset buyer's fortunes are not even necessarily linked to the fortunes of the asset creator.   Indeed, digital assets (like other commodities, but unlike shares in a company) can retain value and remain in circulation even when the entity that created them no longer exists.[3]   An asset cannot plausibly represent a common

---

[3] In fact, that appears to be why the SEC agrees that transactions in two of the most popular digital assets—Bitcoin and Ether—are *not* investment contracts.  *See, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352, 358 (S.D.N.Y. 2020); *Cryptocurrencies: Oversight of New Assets in the Digital Age, Hr'g Before the U.S. H. Comm. on Agric.* 115th Cong. 31, 43 (July 18, 2018) (statement of Gary Gensler).  But it makes no sense for whether transactions in digital assets constitute

enterprise with its creator when it is not even dependent on its creator's continued existence, let alone any ongoing efforts by its creator to increase its value.

74.    The SEC has nevertheless asserted that practically all sales of digital assets, including secondary sales, qualify as investment contracts because "statements by the crypto asset issuers and promoters" that were "made and/or available to" the public have led digital asset buyers "reasonably to expect profits based on the managerial or entrepreneurial efforts of such issuers and promoters (and associated third persons)."  Coinbase Complaint ¶126; *see, e.g.*, *id.* ¶¶133, 145, 173, 195, 208; Binance Complaint ¶¶370, 382, 410, 434, 443; Kraken Complaint ¶¶235, 255, 276, 295, 324.  But as already explained, the mere fact that a buyer may reasonably expect that an asset's creator will expend efforts to increase its value does not convert that purchase into an investment contract.  *See supra* ¶¶70-71. That is equally true whether the buyer's expectations are based on its own evaluation of what the asset creator is likely to do in the future, or on the creator's statements about its future plans.  Either way, the critical question is not whether (or why) the buyer *hopes* to turn a profit on its purchase, but whether the transaction *entitles* the buyer to a stake in a common enterprise that the creator is obligated to manage for the

---

"investment contracts" to turn on the happenstance of whether further efforts are expected from their creator.

buyer's benefit.  Because a secondary sale of a typical digital asset does not involve any such entitlement at all, it is not an investment contract.

75.     The SEC's contrary theory defies both the statutory text and decades of caselaw.  As *Howey* recognized, when Congress included "investment contract" in the definition of a security under the Securities Act and the Exchange Act, it "was using a term the meaning of which had been crystallized by … prior judicial interpretation" by state courts applying state blue-sky laws.  328 U.S. at 298.  That prior judicial interpretation, in keeping with the plain meaning of the statutory text, routinely understood an "investment contract" to require an ongoing contractual obligation on the part of the seller to manage a common enterprise for the purchaser's benefit.  *See, e.g.*, *Stevens v. Liberty Packing Corp.*, 161 A. 193 (N.J. Ch. 1932) (contracts for breeding rabbits and sharing profits or purchasing offspring); *Robbins*, 240 N.W. at 457 (contracts for breeding muskrats and sharing profits); *Prohaska*, 256 Ill.App. at 334-35 (contract for cultivating crops and sharing profits); *Kerst*, 213 N.W. at 904-05 (same); *State v. Ogden*, 191 N.W. 916 (Minn. 1923) (contract for drilling and connecting oil wells and sharing profits from their operation).  And while some later cases suggested that a formal contractual obligation that is enforceable under state law is not strictly required, even those cases uniformly involved some ongoing business relationship between the parties—a relationship that is utterly absent in the secondary sale of a typical digital asset.  *See,*

42

*e.g.*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943) (finding it "unnecessary to determine" whether the buyer "acquired a legal right to compel the drilling of the test well" by the seller under state law because the parties agreed to "a contract in which payments were timed and contingent upon completion of the well").

76.     The SEC's contrary view not only contravenes the statutory text and decades of precedent, but would work a breathtaking expansion of its regulatory authority.  Again, people routinely purchase assets with the hope—or often even expectation—that they will become more valuable over time due at least in part to the efforts of their creators or sellers.  If that alone were enough to render the sale of such items "investment contracts," then the SEC could regulate sales of everything from Nike sneakers to Rolex watches to baseball cards and more.  That would leave the SEC with practically unbounded jurisdiction, and would impose the complex and detailed disclosure requirements of the federal securities laws on all kinds of transactions that have never been understood to fall within their scope.

## 2.     The SEC's novel claim of sweeping regulatory authority is foreclosed by the major questions doctrine.

77.     Even if the Supreme Court had not already settled the issue more than half a century ago, the major questions doctrine would foreclose the SEC's attempt to radically expand its power under unchanged statutory text at this late juncture.  In determining "whether Congress in fact meant to confer the power the agency has

asserted," *West Virginia*, 597 U.S. at 721, courts must "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Courts are accordingly reluctant to interpret "'modest words,' 'vague terms,' or 'subtle devices'" as effecting "[e]xtraordinary grants of regulatory authority." 597 U.S. at 721 (quoting *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001)).

78.    The major questions doctrine demands particular "skepticism" when an agency claims to have discovered in "a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). After all, a longstanding "want of assertion of power by those who presumably would be alert to exercise it" is a telling sign that no "such power was actually conferred." *West Virginia*, 597 U.S. at 726 (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)). And courts are all the more skeptical when an agency claims to have discovered in a long-extant statute a grant of regulatory power that more recent Congresses have considered but affirmatively declined to grant, for when Congress has declined (or is still considering) a request to expand an agency's powers, the agency cannot colorably claim that it has actually possessed those expanded powers all along.

79.    The SEC's attempt to rewrite the term "investment contract" to reach

digital assets implicates all of those concerns and then some. The SEC's late-breaking claim to power over the digital asset industry not only is "unprecedented" on its own terms, but rests on a theory that would effect a "fundamental revision of the statute" and work a "transformative expansion in [the SEC's] regulatory authority." *West Virginia*, 597 U.S. at 724, 728. The words "investment contract" in the Securities Act and the Exchange Act have been in place for nearly a century, and they have never been understood to allow the SEC to regulate pure asset sales without any accompanying ongoing contractual obligations or common enterprises. Nor has the SEC ever before claimed such expansive authority—and rightly so, as the sweeping power it now claims not only would swallow the jurisdiction of other agencies like the CFTC whole, but would threaten to paralyze all manner of transactions in common goods.

80. And that is to say nothing of the devastating impact that the SEC's approach would have on the digital asset industry. How that trillion-dollar industry should be regulated and by whom are indisputably questions of "deep economic and political significance." *King v. Burwell*, 576 U.S. 473, 485-86 (2015). Yet the SEC claims the power to unilaterally turn countless digital asset networks into securities exchanges, brokers, and clearing agencies under the Exchange Act, subjecting them to net-capital requirements, SEC examinations, and more that are wholly unsuited for the industry's needs. Lewis R. Cohen, *Ain't Misbehavin': An Examination of*

45

*Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 81, 96-97 & n.74 (2019). Those demands would cause chaos across the board, destroying value by rendering thousands of transactions infeasible due to unworkable and ill-fitting disclosure requirements and transfer restrictions. *See* Matt Donovan, *Ripple Effect: The SEC's Major Questions Doctrine Problem*, 91 Fordham L. Rev. 2309, 2343 (2023); Rodrigo Seira et al., *SEC's Path to Registration*, Policy (Mar. 23, 2023), https://tinyurl.com/yyycdru7. They would also threaten the many applications of blockchain technology that are not financial in nature, such as digital art, identity verification, community governance, supply chain management, and records and data storage. Still worse, hammering the square peg of the burgeoning digital asset industry into the round hole of the SEC's existing regulatory regime could wipe out many new digital asset creators and prevent startups from entering the market altogether, suppressing competition and technological innovation. *See* Steven Lofchie, et al*., The Securities Law Treatment of Utility Tokens (or Why It Is Past Time for the SEC to Engage with the Hard Questions)*, FFRI Commentary, Jan. 11, 2022, at 7, available at https://tinyurl.com/yc8fvt5p.

81.     The problems do not stop at the water's edge. The SEC's regulatory grab threatens the United States' competitive advantage in the development of these innovative technologies. *See* Letter from Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (Apr. 18, 2022),

https://tinyurl.com/3439e6p5; Letter from Jake Chervinsky, Head of Policy, Blockchain Association, and Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (June 13, 2022), https://tinyurl.com/5d96p4bx.   Indeed, the SEC's aggressive regulation-by-enforcement approach and the regulatory uncertainty it has spawned have already driven some digital asset companies abroad, where the rules are clearer and those companies can more quickly develop and deploy their new products. *See, e.g.*, GAO, GAO-23-105346, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets* (June 2022); *A Review of the Fiscal Year 2024 Budget for the U.S. Securities and Exchange Commission: Hearing before the S. Subcomm. on Fin. Servs. & Gen. Gov't*, 118th Cong. 1:38:00 (2023), https://tinyurl.com/3z6h3kxh;   GAO,   GAO-22-104625, *Blockchain: Emerging Technology Offers Benefits for Some Applications but Faces Challenges* (Mar. 23, 2022).  Countries in Europe, the Middle East, and Asia are starting to lead the way in digital asset innovation and are attracting more and more of the industry, with roughly 70% of digital asset developers now living outside the United States. *See* Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (updated Mar. 20, 2023), https://tinyurl.com/yxedxdyc; Linda Jeng, *Crypto Migration: European and Asian Regulators Welcome Crypto Innovation While U.S. Cracks Down* (Apr. 7, 2023), https://tinyurl.com/47hr5eee.   In short,

authorizing the SEC to supervise practically all transactions involving digital assets would have a dramatic impact on a transformative industry that represents "a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 123, and threatens to stunt American leadership and innovation in a critical technological sector with countless potential financial and non-financial applications.

82.     The SEC's position is particularly untenable given that Congress has repeatedly declined to afford the SEC the power it now seeks.  Members of Congress have introduced dozens of bills related to digital asset regulation in recent years, yet none has passed.  *See* Jason Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, Forbes (May 19, 2022), https://tinyurl.com/4wzwwzre.  Moreover, some of these bills would make clear that the SEC *lacks* regulatory authority over digital assets.  *See, e.g.*, Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021) (defining "digital token" under the Securities Act and excluding it from the definition of "security").  Others would grant that authority to the CFTC, whose "distinct regulatory scheme," *Brown & Williamson*, 529 U.S. at 159-60, *does* reach transactions in commodities without accompanying contractual obligations.  *See, e.g.*, Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022) (providing CFTC jurisdiction over "digital commodity" markets); Digital Commodities Consumer Protection Act of 2022, S.

48

4760, 117th Cong. (2022) (amending Commodities Exchange Act to provide CFTC regulatory jurisdiction over the "digital commodity" spot market). But none of the proposed or introduced bills—including legislation advanced recently from two House committees on a bipartisan basis, *see* Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023)—contemplates vesting the SEC with sole regulatory authority over transactions in digital assets. At most, they envision a role for both the SEC and the CFTC, rather than the exclusive authority the SEC now claims. *See* Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (July 26, 2023), https://tinyurl.com/5hap4pzm.

83.     Those bills thus all confirm the same core point: While Congress is actively wrestling with the complex how-and-who questions concerning the optimal regulatory approach for this significant new industry, it has so far "conspicuously … declined" to grant the SEC the authority it claims it has unwittingly possessed since the 1930s. *West Virginia*, 597 U.S. at 724. Unless and until Congress does so, the SEC cannot "work around the legislative process to resolve for itself a question of great political significance." *Id.* at 743 (Gorsuch, J., concurring).

84.     In sum, all the "indicators from [the Supreme Court's] major questions cases are present" here, *Biden v. Nebraska*, 600 U.S. 482, 504 (2023), and they all compel the same conclusion: If Congress really did want to empower the SEC to

regulate not only the trillion-dollar digital asset industry, but every transaction involving an asset that the purchaser expects will increase in value on account of some future action by the creator, then it would have to speak much more clearly than it did in the nearly century-old statutes that the SEC has belatedly invoked.

## COUNT ONE

85.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

86.     The Declaratory Judgment Act, 28 U.S.C. §2201, allows a party faced with a "genuine threat of enforcement" to bring suit to seek a declaration to determine the legality of an expected government enforcement action. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). LEJILEX and CFAT face just such a genuine threat here.

87.     The SEC has initiated a series of enforcement proceedings against digital asset trading platforms premised on the novel and unsustainable position that practically all digital asset transactions on such platforms are securities transactions under the Securities Act and the Exchange Act, such that the operation of a digital asset platform that is not registered with the SEC violates the federal securities laws.

88.     LEJILEX plans to launch a digital asset trading platform that will allow users to trade digital assets that the SEC has alleged are securities, including MANA, POWR, RGT, RLY, SAND, DASH, and XYO. Because neither those digital assets

nor any other digital assets that will be traded on LEJILEX's platform are securities under the Securities Act and the Exchange Act, and because the SEC in any event has not yet issued regulations making it possible for digital asset trading platforms to register, LEJILEX will not be registering its platform with the SEC.  Given the SEC's history of bringing enforcement actions against other digital asset trading platforms engaged in the same conduct, LEJILEX faces a genuine threat that the SEC will bring an enforcement suit against it if LEJILEX engages in its intended course of conduct.

89.    While CFAT does not face the same direct threat of enforcement, it is injured twice over by the SEC's sweeping assertion of regulatory authority over the digital asset industry.  First, CFAT includes members (such as LEJILEX) that face a significant risk of unlawful SEC enforcement actions based on their planned or ongoing participation in the digital asset industry, and CFAT is harmed by that threat to its members.  Second, CFAT's own mission of advocating for the development of sensible digital asset policies in Texas is hindered by the SEC's claims of broad regulatory authority over nearly the entire digital asset field.

90.    The SEC's position is contrary to the statutory text, history, precedent, and common sense.  It cannot be squared with the SEC's own prior statements or with the fact that Congress has repeatedly declined to grant the SEC the authority that the agency now claims it has had all along.  And if any doubt remained, the

major questions doctrine would foreclose reading long-extant statutes to grant the SEC regulatory authority that it has never before claimed, that would radically expand the scope of its powers, and that would disrupt a trillion-dollar industry.

91.     A declaratory judgment action is therefore proper to allow LEJILEX to determine whether it will be able to conduct its business without risking the severe penalties that the SEC is currently seeking against Coinbase and others.  *Cf., e.g.*, *Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n*, 571 F.Supp.3d 571 (N.D. Tex. 2021) (declaratory judgment action appropriate where EEOC had previously brought enforcement action against a similarly situated entity), *affirmed in relevant part sub nom. Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914 (5th Cir. 2023).  Similarly, a declaratory judgment will allow CFAT to pursue its core mission of advocating on behalf of its members, including LEJILEX, for the development of sensible digital asset policies in Texas.

92.     That same credible threat of enforcement demonstrates LEJILEX's standing to bring this action.  *See Braidwood*, 70 F.4th at 926.  CFAT in turn has standing in light of the obvious threat of harm to its members, including LEJILEX.  *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-44 (1977).  And because this suit seeks only declaratory and injunctive relief against a federal agency and federal officers sued in their official capacities, defendants are not entitled to sovereign immunity.  *See* 5 U.S.C. §702; *Cambranis v. Blinken*, 994 F.3d

457, 462 (5th Cir. 2021); *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *Dalton v. Specter*, 511 U.S. 462, 472 (1994).

93.     LEJILEX and CFAT accordingly seek declaratory and injunctive relief to prevent the SEC from subjecting LEJILEX and CFAT's members to unlawful enforcement actions.

## RELIEF REQUESTED

94.     For the foregoing reasons, Plaintiffs respectfully request that the Court:

a.  Declare that secondary-market sales of digital assets like the ones that LEJILEX intends to facilitate through the Legit.Exchange are not sales of securities as defined by the Exchange Act of 1934 and the Securities Act of 1933;

b.  Declare that the Legit.Exchange is not an unregistered securities exchange under 15 U.S.C. §78e;

c.  Declare that operating the Legit.Exchange will not make LEJILEX an unregistered broker under 15 U.S.C. §78o(a);

d.  Declare that operating the Legit.Exchange will not make LEJILEX an unregistered clearing agency under 15 U.S.C. §78q-1(b)(1);

e.  Enjoin the SEC from bringing an enforcement action against LEJILEX or similarly situated CFAT members premised on any purported failure to register as securities exchanges, brokers, or clearing agencies;

f.  Award any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law; and

g.  Award any further relief the Court deems just and proper.

February 21, 2024

Respectfully submitted,

/s/ *Randy D. Gordon*
Randy D. Gordon
Texas State Bar No. 00797838
RDGordon@duanemorris.com
John S. Polzer
Texas State Bar No. 24042609
JSPolzer@duanemorris.com
Christopher A. Brown
Texas State Bar No. 24086265
CABrown@duanemorris.com
Joakim G. Soederbaum
Texas State Bar No. 24091338
JSoederbaum@duanemorris.com
**DUANE MORRIS LLP**
777 Main Street, Suite 2790
Fort Worth, TX 76102
Tel: (817) 704-1000
Fax: (817) 887-2304


PAUL D. CLEMENT (*pro hac vice* pending)
ERIN E. MURPHY (*pro hac vice* pending)
C. HARKER RHODES IV (*pro hac vice*
    pending)
NICHOLAS M. GALLAGHER (*pro hac vice*
    pending)*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the
Virginia Bar

*Counsel for Plaintiffs*