## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| Lejilex; Crypto Freedom Alliance of Texas, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) ) | Case No. 4:24-cv-00168-O |
| Securities and Exchange Commission; Eric R. Werner; Gary Gensler; Caroline A. Crenshaw; Jaime E. Lizárraga; Hester M. Peirce; and Mark T. Uyeda, in their official capacities, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

---

## BRIEF OF PARADIGM OPERATIONS LP AS AMICUS CURIAE
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

## INTEREST OF AMICUS CURIAE

Paradigm Operations LP ("Paradigm") is an American investment firm that backs entrepreneurs building companies and protocols that leverage crypto and related technologies at the frontier of innovation. Paradigm takes a hands-on approach to helping these projects achieve their full potential. It provides services that range from technical (mechanism design, smart contract security, and engineering) to operational (recruiting and regulatory strategy).

Paradigm has an interest in the outcome of this litigation because Plaintiffs' Complaint and Motion for Summary Judgment address a fundamental obstacle to participants in the crypto marketplace: The ongoing confusion surrounding the SEC's claimed authority to regulate crypto, tokens, and related trading platforms. The resulting uncertainty impacts the entrepreneurs that Paradigm backs, because it leaves them unsure of the law's requirements and uncertain whether the SEC will target them. Paradigm submits that a ruling for Plaintiffs in this action would bring valuable clarity to the law.[1]

---

[1] Paradigm is a member of Plaintiff Crypto Freedom Alliance of Texas. Additionally, a Paradigm employee is on the Board of Plaintiff Crypto Freedom Alliance of Texas. However, Paradigm and its counsel drafted this amicus curiae brief themselves. Neither Plaintiffs nor their counsel authored this brief in whole or in part. No person—other than amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this amicus curiae brief.

TABLE OF CONTENTS

Interest of Amicus Curiae ..................................................................... ii

Table of Authorities ............................................................................ iv

Introduction & Summary of Argument ....................................................1

Argument ............................................................................................2

    I.    Crypto assets are fundamentally different from securities. .....................2

        A.    Crypto exists and accrues value independently of its creator ..........3

        B.    Crypto creators have no ongoing obligations to crypto owners .......6

        C.    Crypto owners have no control over crypto creators. .......................7

        D.    Crypto is traded seamlessly. ..................................................8

    II.    The SEC's regulatory framework for securities makes no sense for crypto. .........................................................................................9

        A.    The SEC's regulations demand irrelevant information. ..................11

        B.    The SEC's regulations ignore useful information. ...........................13

Conclusion ........................................................................................16

TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

15 U.S.C. § 77b(a)(1) ........................................................................................1

15 U.S.C. § 78c(a)(10) ......................................................................................1

**Regulations**

17 C.F.R. § 229.101(c)(1)(i) ...........................................................................13

17 C.F.R. § 229.106 .........................................................................................17

17 C.F.R. § 229.202 .........................................................................................17

17 C.F.R. § 229.303 .........................................................................................13

17 C.F.R. § 229.401(e) .....................................................................................14

17 C.F.R. § 229.504 .........................................................................................15

**Other Authorities**

Hester M. Peirce, Comm'r, SEC, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.* (Feb. 9, 2023), https://perma.cc/2FUE-9XZ7 .................................................................................................4

Hester M. Peirce, Comm'r, SEC, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), https://perma.cc/4TGM-SF73 .................................3

Hester M. Peirce, Comm'r, SEC, *Pourquoi Pas? Securities Regulation and the American Dream: Remarks before the Association of Private Enterprise Education* (Apr. 8, 2024), https://perma.cc/QXQ7-WR3K ..............3, 16

Hester M. Peirce, Comm'r, SEC, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange* (Apr. 14, 2023), https://perma.cc/P2KP-7372. ......................................................................11

iv

Hester M. Peirce, Comm'r, SEC, *Token Safe Harbor Proposal 2.0* (Apr. 13, 2021), https://perma.cc/ESZ3-533E ..................................................................16

Hester M. Peirce & Mark T. Uyeda, Comm'rs, SEC, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG* (Mar. 5, 2024), https://perma.cc/P852-PFKQ ..........................................................4

Lewis Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022), https://tinyurl.com/4zewykcs ..............................................................5, 8

Matt Donovan, Note, *Ripple Effect: The SEC's Major Questions Doctrine Problem*, 91 Fordham L. Rev. 2309 (2023) ....................................................4

Paradigm, *Due to SEC Inaction, Registration is Not a Viable Path for Crypto Projects* (Mar. 23, 2023), https://perma.cc/QFU7-R38R ...........................12

Paradigm, *Lessons from Crypto Projects' Failed Attempts to Register with the SEC* (Mar. 23, 2023), https://perma.cc/W6WU-XFNG ....................................12

Paradigm, *The Current SEC Disclosure Framework Is Unfit for Crypto* (Apr. 20, 2023), https://perma.cc/T74K-FXGY .......................................................12

Usha Rodrigues, *Law and the Blockchain*, 104 Iowa L Rev 679 (2019) .......................7

INTRODUCTION & SUMMARY OF ARGUMENT

The Court should award summary judgment to Plaintiffs to halt the SEC's campaign against crypto. The SEC regulates "investment contracts," but Congress defined that term to limit the agency's authority—not to invite the agency to seize regulatory dominion over sales of assets. 15 U.S.C. § 77b(a)(1); *see id*. § 78c(a)(10) (similar). That is why the SEC has targeted crypto only via enforcement actions and has steadfastly refused to issue crypto-specific regulations or other guidance that would necessarily reveal the stark contrast between securities and crypto assets. To illustrate that point, Paradigm respectfully submits for the Court's consideration four of the key practical differences between crypto and securities.[2]

*First*, the relationship between crypto assets and crypto creators is nothing like the relationship between securities and their issuers. Unlike securities issuers, creators have no ongoing control over crypto assets, and no ongoing involvement in their value. A crypto asset can exist independently of its creator, and it accrues value based on how useful it is (or based on the market's predictions about future usefulness). *Second*, the relationship of a business to its shareholders is unlike the relationship between a crypto asset owner and creator. Creators do not by default owe fiduciary or any other duties to crypto owners. *Third*, and similarly, owning crypto does not come with any corresponding right to control the creator— certainly nothing akin to shareholders' traditional relationship to a corporation and its directors or management. *Fourth*, crypto is traded on markets that are intentionally decentralized and otherwise inhospitable to consolidation of power

---

[2] This brief uses "crypto" to refer to all digital assets that are issued and transferred on public blockchains.

and attendant rent-seeking middlemen. This is again unlike the highly centralized, transaction-cost heavy relationships among securities dealers, brokers, exchanges, clearinghouses, and the like.

These practical differences have practical consequences. Attempting to brute-force crypto assets into a securities regime will not help investors, and at its worst, serves as a de facto ban on crypto assets in the United States. If crypto assets were deemed securities, then they may be subject to the SEC's disclosure rules. But those rules demand information that is unavailable or irrelevant for crypto assets and decentralized projects. Worse, those rules also ignore material information and can also mislead potential crypto purchasers—for example, by suggesting a link between the creator's financial condition and a crypto asset's value when there is none. The SEC's campaign of enforcement actions ignores this reality. That is why a sitting SEC Commissioner recently described these actions as "troubling"[3] and characterized the existing disclosure regime as "wrong-headed."[4] The Commissioner is right. And so are Plaintiffs.

The Court should grant Plaintiffs' motion for summary judgment.

ARGUMENT

## I.    Crypto assets are fundamentally different from securities.

Crypto assets and securities share little in common. Each have value that may fluctuate—just like currency, commodities, or collectibles. But the similarities

---

[3] Hester M. Peirce, Comm'r, SEC, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), https://perma.cc/4TGM-SF73.

[4] Hester M. Peirce, Comm'r, SEC, *Pourquoi Pas? Securities Regulation and the American Dream: Remarks before the Association of Private Enterprise Education* (Apr. 8, 2024), https://perma.cc/QXQ7-WR3K.

2

end there. The relationships between and among crypto creators, crypto owners, crypto assets, and crypto markets all illustrate the stark differences between crypto assets and securities. Despite those omnipresent differences, the SEC claims pervasive yet "opaque and arbitrary" power to regulate nearly every aspect of crypto using enforcement actions.[5] "Using enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating."[6] Nor is it lawful, as Plaintiffs have explained.[7] Paradigm urges the Court to reject that overreach and to restore predictability and certainty to the burgeoning crypto marketplace.

### A.    Crypto exists and accrues value independently of its creator.

A security cannot exist without an issuer. When a public company liquidates or dissolves, its stock certificates become worthless—at best a vestige of an ownership interest that no longer exists. For securities, it makes no sense to discuss a stock price independent of the underlying firm as an ongoing business.

Not so for crypto. Once someone creates a crypto asset—or "mints" it, in industry parlance—that asset can live on in perpetuity. The creator can encourage

---

[5] Hester M. Peirce & Mark T. Uyeda, Comm'rs, SEC, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG* (Mar. 5, 2024), https://perma.cc/P852-PFKQ.

[6] Hester M. Peirce, Comm'r, SEC, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.* (Feb. 9, 2023), https://perma.cc/2FUE-9XZ7.

[7] *E.g.*, Lejilex MSJ (ECF 35 at 31-36); *see also, e.g.*, Matt Donovan, Note, *Ripple Effect: The SEC's Major Questions Doctrine Problem*, 91 Fordham L. Rev. 2309, 2352 (2023) ("[M]ost crypto assets are not enumerated securities like stocks or notes and, unlike many of their offerings, most crypto assets themselves are not investment contracts as defined by Supreme Court . . . .").

others to buy or use the crypto assets, just like the company Ty can advertise its Beanie Babies. But beyond those efforts, the creator has no control over the crypto it has minted. Indeed, crypto assets can and do persist even if their creator dissolves, liquidates, or just loses interest. That is because—unlike securities—crypto assets have no necessary link to their creator.[8] They can persist in existence without the ongoing efforts of their creator or anyone else. That is not possible with securities.

Also unlike securities, crypto does not accrue value based on the business acumen of directors, managers, and other insiders who work for or own the crypto asset's creator. Instead, people buy crypto to use it—or to hold it because they expect demand for its use to surge in the future.

Securities pricing reflects expectations about a company's future financial performance. For example, stock prices reflect the market's expectation of a company's future earnings and growth potential. Similarly, bond prices reflect assessments about a company's creditworthiness and the overall interest rate environment. More complex securities (*e.g.*, futures or options) derive their value from the price or price expectations of another asset (*e.g.*, stocks or bonds). In each instance, factors like company-specific news, industry trends, and the overall economy can affect the market's expectations, and thus affect the security's price.

---

[8] *See* Lewis Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* 98 (Nov. 10, 2022), https://tinyurl.com/4zewykcs ("Crypto Assets Are Not Securities") ("To presume that crypto assets are all securities would require a legislative change recognizing crypto assets as a new category of issuer-independent securities . . . .").

By contrast, crypto prices are not tied to the financial performance of the company, group, or individual who created the crypto asset. Instead, crypto prices fluctuate based on the utility of the crypto asset (as they oftentimes come with technological capabilities that are enforced by blockchain-based protocols), or the market's view of the asset's utility or potential utility. Put differently, people buy crypto to use it, or because they expect that others will want to use it later. That inherent utility is the biggest component of a crypto asset's price. And it is a huge difference between crypto and securities. Securities hold their value through the ownership interest they represent. For crypto, the utility is what creates the value, just as with commodities. The value of a barrel of oil is not determined by who owns it or the method it was purchased, but what it can be used for. So it is with crypto.

Further, because most crypto projects are open-source, many crypto assets gain utility (and thus accrue value) based on contributions from the community that uses the asset—not from insiders' business decisions or managerial efforts. Indeed, many crypto projects do not have "inside" decisionmakers or any other equivalent to managers or directors that manage the crypto assets. That is because blockchain technology enables self-executing smart contracts and other decentralized systems that allow decisions to occur by consensus and in the open. As communities further develop the original network and build applications in the ecosystem, the creators of the crypto asset have less and less influence over the project. In turn, purchasers of the crypto asset do not rely on or look to the efforts of the original creator. It is also likely that the creator will no longer have better information about the value proposition of the network or application relative to

the broader decentralized community. That is because the community can innovate additional utility that a creator never envisioned.[9]

### B. Crypto creators have no ongoing obligations to crypto owners.

All securities involve ongoing obligations that extend from the issuer (or seller) to the purchaser. *See* Lejilex MSJ (ECF 35 at 24). That's easy to conceptualize in the context of a corporation, which owes contractual obligations to stockholders, including dividends and other rights as set forth in the corporation's charter. Bonds are contracts too: the issuer promises to pay the bondholder the principal on a specified date, and to make periodic interest payments until then. *See* Lejilex MSJ (ECF 35 at 5). Futures contracts obligate the seller to sell an asset at a predetermined time and price. So too for options that the buyer chooses to exercise. Some securities also involve fiduciary obligations. A corporation's managers and directors owe fiduciary duties to stockholders. And for mutual funds and exchange-traded funds, managers have a fiduciary duty to manage the fund in the best interest of the shareholders.

Crypto is different. When a group or a company mints crypto, it does not create any ongoing obligations between itself and whoever purchases the crypto. *See* Lejilex MSJ (ECF 35 at 31). Instead, the crypto comes into being as an asset, just like when the De Beers company puts a diamond into circulation. Nor do crypto creators necessarily owe any fiduciary duties to crypto owners. To be sure—

---

[9] Ethereum is an excellent example of community innovation that has carried a crypto asset far beyond the creator's initial vision. *See, e.g.*, Usha Rodrigues, *Law and the Blockchain*, 104 Iowa L Rev. 679, 697 (2019) (discussing Ethereum's history and "the potential for business associations to exist on the blockchain, using smart contracts to effectuate the functions of business law").

crypto, smart contracts, and blockchain technology *can* be used to reinforce fiduciary duties. And crypto *can* be used in securitizations, too. But these use-cases are just examples of the inherent utility that drives crypto's value. They do not transform crypto itself into a security any more than a printed stock certificate transforms paper itself into a security.[10]

### C. Crypto owners have no control over crypto creators.

Stockholders have direct control of a corporation through voting rights. This allows them to vote on key matters facing the corporation, such as the election of the board of directors, mergers, and other significant corporate actions. Stockholders do not have direct control over humdrum corporate decisionmaking, but their overall ownership interest in the corporations does give them indirect influence over those decisions. For example, institutional investors can use their significant ownership stakes to pressure a corporation's management into making strategic changes or into adopting certain policies. And the threat of a shareholder vote against management's proposals can lead executives to consider stockholder interests more carefully in their day-to-day management decisions.

Crypto has none of these features. Unlike traditional stockholders and other holders of equity securities, crypto owners do not have voting rights or any formal mechanism to influence the management or operations of the entity or project that created the crypto asset. True, some blockchain projects offer governance tokens that grant voting rights – but these are voting rights regarding the decentralized

---

[10] *See* Crypto Assets Are Not Securities at 69 ("[A] crypto asset that neither creates, nor is intended to represent, a legal relationship between an identifiable issuer and the persons who, from time to time, own that asset cannot be an 'instrument' (or any other type of security, for that matter) . . . .").

network the crypto assets live on – they are not voting rights in the entity or project that created the crypto asset. And, again, the fact that crypto *can* be used to reinforce governance is just an example of the inherent utility that crypto offers.

Moreover, the decentralized nature of most crypto projects means that there is no central authority or board of directors for a crypto owner to even attempt to exert influence over. Instead, decisions are made by the community or through pre-determined protocols coded into the blockchain. Both of these features encourage further decentralization and resistance to consolidation of power. The lack of traditional governance mechanisms also reduces the conflicts of interest that can occur in a traditional corporation, such as the conflict between a manager's self-interest and the manager's fiduciary duties to the corporation.

### D.    Crypto is traded seamlessly.

Securities markets would grind to a halt without the network of middlemen that keep them functioning. Brokers act as agents for investors, executing buy and sell orders on their behalf. Dealers, on the other hand, buy and sell securities from their own inventory. This injects necessary liquidity, helping to ensure that a willing seller can find a willing buyer, and vice versa. Exchanges, such as the New York Stock Exchange or NASDAQ, contribute order and harmony by offering a central venue where securities are listed and traded. Clearinghouses step in to handle the post-trade processing after a trade is executed. This includes the confirmation, settlement, and delivery of the securities to the buyer. Clearinghouses are necessary to mitigate the counterparty risk of either the buyer or the seller not following through. This elaborate yet primitive infrastructure is essential for maintaining the efficiency and integrity of securities markets.

Crypto markets do not require any of these oftentimes fee-based intermediaries. Instead, they operate on open-source, decentralized protocols powered by computer code and blockchain technology. Crypto transactions can be conducted between buyer and seller directly through peer-to-peer networks. This eliminates the need for brokers and dealers. Decentralized exchanges use smart contracts to facilitate and automate transactions. These smart contracts ensure that trades are executed automatically—but only when predetermined conditions are met. This enhances trust and reduces the risk of fraud without the need for a centralized exchange.

Furthermore, blockchain technology provides the transparency and security that securities markets sell as a service. For crypto markets, every transaction is recorded on a public ledger that is immutable and verifiable. Clearing and settlement—which can take days in securities markets—occur right away in crypto markets. Blockchain technology's speed also reduces the risk of counterparty default. In turn, this increases the efficiency of crypto trading. By removing intermediaries, crypto markets offer a more streamlined and efficient trading experience that democratizes access to financial markets and increases overall efficiency. Even so, the SEC has "aggressively expand[ed] its regulatory reach to solve problems that do not exist" in crypto markets.[11]

## II.    The SEC's regulatory framework for securities makes no sense for crypto.

The fight about crypto versus securities matters immensely, because an asset's status as a "security" can trigger the SEC's complex disclosure regulations.

---

[11] Hester M. Peirce, Comm'r, SEC, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange* (Apr. 14, 2023), https://perma.cc/P2KP-7372.

Those regulations are necessary in the securities context, because they protect investors by requiring issuers to provide detailed information about their financial condition, operations, and management. These disclosures help prevent fraud, and they allow investors to make better decisions based on public data. Without such regulations to address informational asymmetries, investors would be at risk of losing their money due to inadequate information or misleading practices.

Given the differences discussed in Part I of this brief, it's no surprise that the SEC's regulations for securities cannot be coherently applied to crypto. Yet the SEC's crypto-enforcement docket keeps plowing ahead all the same.[12] Comparing the disclosure regulations to crypto markets shows just how misguided those efforts are. In particular, the SEC's securities framework demands irrelevant information from crypto projects while at the same time ignoring material information. At best, these mismatches are expensive make-work for crypto companies.[13] But at worst, the regime could be used to serve as a de facto ban on many crypto companies' ability to operate in the U.S. at all. The regime also risks affirmatively misleading the public by suggesting that information required by the disclosures is material information to be considered when making investment decisions (even when information that is truly material to those decisions is simultaneously *not* provided for in the current disclosure regime).[14]

---

[12] *See, e.g.*, Paradigm, *Lessons from Crypto Projects' Failed Attempts to Register with the SEC* (Mar. 23, 2023), https://perma.cc/W6WU-XFNG.

[13] *See, e.g.*, Paradigm, *Due to SEC Inaction, Registration is Not a Viable Path for Crypto Projects* (Mar. 23, 2023), https://perma.cc/QFU7-R38R.

[14] *See, e.g.*, Paradigm, *The Current SEC Disclosure Framework Is Unfit for Crypto* (Apr. 20, 2023), https://perma.cc/T74K-FXGY.

## A. The SEC's regulations demand irrelevant information.

The entire point of the SEC's disclosure framework is to provide the public with relevant information about the factors that could affect the value of securities. Thus, for example, the SEC requires companies to disclose financial statements, such as balance sheets, income statements, and cash flow statements, along with detailed information about their operations, management, risks, and any material events that could impact the company's performance. This includes information on executive compensation, significant litigation, and conflicts of interest.

But companies need not affirmatively disclose mundane or irrelevant information, such as routine supply contracts or vendor arrangements. Indeed, including those in a disclosure statement could mislead the public into thinking they matter. Yet for crypto, the SEC's disclosure framework contains demands for information that are fundamentally incompatible with decentralized projects. Consider three examples.

***Business and financial information.*** Under the SEC's framework, a company that wants to issue securities (*i.e.*, a "registrant") must provide a detailed description of their business, including their "[r]evenue-generating activities, products and/or services." 17 C.F.R. § 229.101(c)(1)(i). Registrants also must provide "[m]anagement's discussion and analysis of financial condition and results of operations." 17 C.F.R. § 229.303. These demands are incoherent for crypto, which is often created by scattered groups of individuals who have no revenue, products, services, or management to disclose. Even for projects that do have some of those characteristics, providing this information may not be particularly material. Worse, it might actually mislead purchasers. That is because a crypto creator's financial condition is not indicative of whether the crypto asset

11

will perform well in the market. For example, a crypto creator may not earn anything at all even if the crypto assets they create become very useful (and thus very valuable). Thus, a crypto asset's creator often has little relevance to the asset's value, and that relevance only diminishes over time. Disclosing information about the creators' operations, revenue, and profits is therefore irrelevant, if not outright misleading.

*Management information.* The SEC's disclosure framework is designed for companies with a traditional management team. This approach works well for centralized companies that have a clear chain of command. In those contexts, it is straightforward to "describe the business experience during the past five years of each director, executive officer, [and significant employee]." 17 C.F.R. § 229.401(e).

But for decentralized crypto projects, these disclosures are either useless or impossible. First, crypto projects can and do thrive without a centralized management team. Instead, they often rely on a decentralized network of contributors and developers who may not have formal titles or roles within a single organization. Second, even when a crypto project does have identifiable individuals who play significant roles, their backgrounds are often irrelevant to how useful the crypto will be—just as corn and other commodities do not become more valuable because their seller holds an MBA. Third, even if the original team remains involved in a project, their importance can be, and oftentimes is, overshadowed by outside contributors. These third parties often enhance a crypto project's utility and growth without any formal relationship to the entity that created the asset.

Describing the management structure of a crypto asset's creator can also mislead the public. It can create the false impression that the original creator retains control over the project, when in reality, control and influence may be dispersed across a wide network of contributors. This misrepresentation can skew investors' understanding of the project's operational dynamics and can lead to incorrect assumptions about its governance and future direction. Here again, then, the SEC's regulatory framework for securities is a poor fit for crypto assets.

*Use of proceeds.* The SEC also requires securities registrants to "[s]tate the principal purposes for which the net proceeds to the registrant from the securities to be offered are intended to be used." 17 C.F.R. § 229.504. But many crypto assets are distributed in ways that generate no proceeds at all. For example, a crypto creator might distribute crypto assets for free to anyone who has a digital wallet to accept them (a practice known as "airdropping"). Or a creator might distribute crypto to individuals who "stake" their own assets to validate transactions on the blockchain (*e.g.*, Ethereum distributes the "ether" token to users that help validate transactions on the Ethereum blockchain). Neither practice generates proceeds. And even when distributions *do* generate proceeds, the crypto asset's creators may have no control over how those proceeds are used. For example, it is common for proceeds to go to a "treasury" that is controlled by the larger, decentralized community of individuals who hold a crypto asset. All this makes it unworkable for a creator to disclose "use of proceeds" information in a registration statement.

**B.    The SEC's regulations ignore useful information.**

This is not to say there is *no* information that the public might find useful about crypto projects. On the contrary, crypto owners would benefit from disclosures relating to a crypto project's utility, governance, and security, among

other things.[15] But the SEC's framework does none of that. That is why SEC Commissioner Hester Peirce has argued it is "wrong-headed" for the SEC to "insist[] the existing disclosure regime works just fine for crypto" and to "[i]nsist[] on treating tokens offered by tiny crypto projects as if they are shares in an IPO-ready company."[16] Consider just a few examples (among many more) of how the SEC's framework ignores material information about crypto.

*Utility.* Crypto is valuable because it is useful. *See supra* p.3. Accordingly, information about a crypto asset's usefulness is perhaps the most important thing for a potential purchaser to know. For example: What technological abilities does the crypto asset provide in a particular blockchain-based protocol? Which merchants or applications accept the crypto, and is the crypto cheaper and more efficient to use than fiat currencies? Does the crypto offer any unique features, such as privacy enhancements or smart-contract capabilities? What platforms or applications can the crypto be used with or integrated into? And because utility is correlated with how much of the crypto asset is available, potential purchasers will want to know about supply. How large is the initial distribution of crypto? Will new crypto be minted? How will the crypto be distributed? The securities-disclosure framework leaves all this unaddressed.

*Governance.* A securities registrant must explain a lot about how the company is governed—who the managers are, whether the directors are

---

[15] *See, e.g.*, Hester M. Peirce, Comm'r, SEC, *Token Safe Harbor Proposal 2.0* (Apr. 13, 2021), https://perma.cc/ESZ3-533E.

[16] Hester M. Peirce, Comm'r, SEC, *Pourquoi Pas? Securities Regulation and the American Dream: Remarks before the Association of Private Enterprise Education* (Apr. 8, 2024), https://perma.cc/QXQ7-WR3K.

independent, what voting rights shareholders have, and the like. *E.g.*, 17 C.F.R. § 229.202. That is because companies are governed by people. By contrast, crypto and blockchains are governed by code. Therefore, the relevant governance information for a crypto project is along the following lines: Is the code upgradeable? How are decisions about code changes made and approved? Is the code open-source and available for public review? What mechanisms are in place to handle potential security vulnerabilities or bugs in the code? How often is the code audited by independent third parties? And so on. The SEC's regulatory framework for securities disclosures does not address any of these issues.

*Security.* Finally, a securities registrant must disclose information related to cybersecurity. *E.g.*, 17 C.F.R. § 229.106. Even in today's digital world, cybersecurity is little more than an expensive afterthought for many public companies. But crypto assets live in the digital world. Therefore, crypto creators must be extremely vigilant when it comes to cybersecurity and security-by-design. This information is also highly relevant to potential purchasers, for example: What encryption methods are used to secure transactions and user data? How are private keys stored and protected? What measures are in place to prevent hacking and unauthorized access? How does the project plan to handle security breaches? Are there any bug-bounty programs to encourage finding vulnerabilities? What is the frequency and scope of security audits conducted on the project? The SEC's securities framework provides for no useful disclosures about any of this.

These regulatory mismatches again highlight the fundamental differences between securities and crypto. They illustrate that the SEC's claimed authority to regulate crypto is just an excuse to target projects that the SEC dislikes. Because no

one can comply, everyone is a target. Plaintiffs' lawsuit correctly seeks to end the SEC's arbitrary and unpredictable crypto enforcement regime.

CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated: July 10, 2024

Respectfully submitted.

*/s/ Kyle D. Hawkins*

Kyle D. Hawkins
William T. Thompson
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lkcfirm.com
will@lkcfirm.com
josh@lkcfirm.com

*Counsel for Amicus Curiae*

16