**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| LEJILEX; CRYPTO FREEDOM ALLIANCE OF TEXAS, <br><br>        *Plaintiffs*, <br><br>        v. <br><br> SECURITIES AND EXCHANGE COMMISSION; ERIC R. WERNER; GARY GENSLER; CAROLINE A. CRENSHAW; JAIME E. LIZÁRRAGA; HESTER M. PEIRCE; and MARK T. UYEDA, in their official capacities, <br><br>        *Defendants*. | Civil Action No. 4:24-cv-00168-O |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**AND FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 3

ARGUMENT .................................................................................................... 5

I.     This Court Can And Should Decide The Merits Of This Case ........................ 5

      A.    Plaintiffs' Claims Are Justiciable ............................................... 6

           1.    Plaintiffs have Article III standing ........................................ 6

           2.    Plaintiffs' claims are ripe ..................................................... 11

      B.    Plaintiffs' Claims Are Not Barred by Sovereign Immunity ................... 17

      C.    Plaintiffs Have Causes of Action for Declaratory and Injunctive Relief ............. 24

      D.    Plaintiffs' Claims Raise a Discrete Pre-Enforcement Challenge, Not a Programmatic Challenge ................................................................ 28

      E.    This Court Should Decide Plaintiffs' Claims ................................... 32

II.    The SEC Has No Statutory Authority To Regulate The Digital Asset Transactions That Will Occur On LEJILEX's Platform ................................ 35

      A.    Digital Asset Transactions on LEJILEX's Platform Will Contain None of the Essential Characteristics of an Investment Contract ...................... 35

      B.    The SEC's Attempts to Evade Any Limit on Its Authority Are Unavailing ................................................................................. 39

CONCLUSION ................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ................................................................................................... 11, 16

*Agri-Trans Corp. v. Gladders Barge Line, Inc.*,
   721 F.2d 1005 (5th Cir. 1983) ........................................................................................... 34

*Ala.-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) .................................................................... 18, 21, 22, 30

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ................................................................................................................. 25

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ................................................................................................... 20, 25, 32

*AT&T Corp. v. FCC*,
   349 F.3d 692 (D.C. Cir. 2003) .......................................................................................... 17

*Bear Creek Bible Church v. EEOC*,
   571 F.Supp.3d 571 (N.D. Tex. 2021) ................................................................... *passim*

*Biden v. Nebraska*,
   143 S.Ct. 2355 (2023) ........................................................................................................ 38

*Braidwood Mgmt., Inc. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) .................................................................................... *passim*

*Calderon v. Ashmus*,
   523 U.S. 740 (1998) ............................................................................................................. 15

*Carroll v. Safford*,
   44 U.S. (3 How.) 441 (1845) ............................................................................................ 25

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ......................................................................................... 25

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986) ......................................................................................... 15

*Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*,
   915 F.2d 167 (5th Cir. 1990) ................................................................................... 20, 24

*Colo. River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ................................................................................................... 15, 32

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ................................................................ 25

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ................................................................ 41

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ................................................................ 15

*Groos Nat'l Bank v. Comptroller of Currency*,
    573 F.2d 889 (5th Cir. 1978) ................................................................ 34

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................ 23

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................ 31

*Louisiana v. United States*,
    948 F.3d 317 (5th Cir. 2020) ................................................................ 30

*Lowe v. Ingalls Shipbuilding*,
    723 F.2d 1173 (5th Cir. 1984) ................................................................ 20

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................ 27, 29, 30

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ................................................................ *passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ................................................................ 16

*Neese v. Becerra*,
    640 F.Supp.3d 668 (N.D. Tex. 2022) ................................................................ 20, 24

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    833 F.2d 583 (5th Cir. 1987) ................................................................ 11

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
    344 U.S. 237 (1952) ................................................................ 15

*SEC v. Arcturus Corp.*,
    928 F.3d 400 (5th Cir. 2019) ................................................................ 36, 37

*SEC v. Binance Holdings Ltd.*,
    No. 1:23-cv-01599 (D.D.C. filed June 5, 2023) ................................................................ 8

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)......................................................................................... 41

*SEC v. Coinbase, Inc.*,
    2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ........................................... 39, 41, 42

*SEC v. Coinbase, Inc.*,
    No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023) ..................................................... 8

*SEC v. Payward, Inc.*,
    No. 3:23-cv-06003 (N.D. Cal. filed Nov. 20, 2023) .................................................. 8

*SEC v. Ripple Labs, Inc.*,
    682 F.Supp.3d 308 (S.D.N.Y. 2023) ...................................................................... 37

*SEC v. Terraform Labs Pte. Ltd.*,
    684 F.Supp.3d 170 (S.D.N.Y. 2023) ...................................................................... 42

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)......................................................................... 36, 39, 40, 41

*Sherwin-Williams Co. v. Holmes Cnty.*,
    343 F.3d 383 (5th Cir. 2003) ................................................................................. 33

*Sierra Club v. Peterson*,
    228 F.3d 559 (5th Cir. 2000) ................................................................................. 30

*Steffel v. Thompson*,
    415 U.S. 452 (1974)................................................................................................ 7

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................................................ 7, 9

*Tex. Emps.' Ins. Ass'n v. Jackson*,
    862 F.2d 491 (5th Cir. 1988) ................................................................................. 33

*Tex. Med. Ass'n v. Aetna Life Ins. Co.*,
    80 F.3d 153 (5th Cir. 1996) ................................................................................... 34

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................................. 23

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985)....................................................................................... 11, 16

*TOTAL Gas & Power N. Am., Inc. v. FERC*,
    859 F.3d 325 (5th Cir. 2017) ................................................................................. 17

iv

*United States v. Texas*,
   97 F.4th 268 (5th Cir. 2024) ............................................................ 25

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ........................................................................ 38

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
   535 U.S. 635 (2002) ........................................................................ 26

*Walmart Inc. v. U.S. Dep't of Justice*,
   21 F.4th 300 (5th Cir. 2021) .......................................... 12, 17, 18, 22

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................................ 31

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................................................................ 38

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ........................................................................ 32

**Statutes**

5 U.S.C. §551(10) ................................................................................. 22

5 U.S.C. §551(13) ................................................................................. 22

5 U.S.C. §701(a)(2) .............................................................................. 23

5 U.S.C. §702 ....................................................................................... 18

5 U.S.C. §704 ....................................................................................... 28

15 U.S.C. §77b(a)(1) ............................................................................ 35

15 U.S.C. §77t(b) ........................................................................... 20, 25

15 U.S.C. §78c(a)(10) .......................................................................... 35

15 U.S.C. §78e ............................................................................... 20, 25

15 U.S.C. §78o(a) ......................................................................... 20, 25

15 U.S.C. §78q-1(b)(1) .................................................................. 20, 25

15 U.S.C. §78u(d)(1) ..................................................................... 20, 25

28 U.S.C. §2201(a) .............................................................................. 24

**Other Authorities**

Complaint, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599
(D.D.C. filed June 5, 2023) ................................................................................. 14

Complaint, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738
(S.D.N.Y. filed June 6, 2023) ............................................................................... 14

Complaint, *SEC v. Payward, Inc.*, No. 3:23-cv-06003
(N.D. Cal. filed Nov. 20, 2023) ............................................................................ 14

Chair Gary Gensler, *Statement on the Approval of Spot Bitcoin Exchange-Traded
Products*, U.S. Securities and Exchange Commission (Jan. 10, 2024),
http://tinyurl.com/4jmzwy3d ................................................................................. 9

## INTRODUCTION

The federal securities laws authorize the SEC to regulate *securities*. A typical digital asset—as its name suggests—is just an asset, not a security, because it does not involve any ongoing investor/investee relationship. The SEC accordingly has no authority to regulate platforms that facilitate standalone secondary-market purchases and sales of typical digital assets, because those asset purchases and sales do not involve the kind of ongoing reciprocal undertakings required to create a traditional investment relationship. Since standalone secondary-market purchases and sales of digital assets that do not involve any ongoing investor/investee relationship are the only conduct at issue in this case, Plaintiffs are entitled to judgment. It is as simple as that.

The SEC has no meaningful response to those straightforward principles, so it devotes most of its energy to trying to avoid judicial review. But the threshold objections it raises are meritless—and indeed are largely foreclosed by recent precedent from this Court and the Fifth Circuit addressing virtually identical efforts to evade judicial review. Despite the SEC's repeated efforts to pretend otherwise, this case is just a straightforward pre-enforcement challenge seeking judicial relief to prevent an agency from injuring Plaintiffs themselves by exceeding its statutory authority. The SEC has already brought multiple enforcement actions against other entities for doing what LEJILEX is planning to do, making clear beyond any reasonable dispute that LEJILEX faces a concrete and imminent threat of unlawful SEC enforcement when it launches its digital asset trading platform. Indeed, while the SEC cagily refuses to openly admit that it would bring an enforcement action against LEJILEX, it conspicuously declines to disavow any intention to do so, and it nowhere denies that it views the conduct in which LEJILEX plans to engage as a violation of the securities laws. As a matter of settled law, neither Article III nor anything else requires Plaintiffs to actually engage in conduct the SEC has already declared unlawful—thereby risking massive liability—before they can ask this Court to decide whether that conduct is in fact unlawful.

1

For largely the same reasons, the SEC's invocation of sovereign immunity, its insistence that Plaintiffs lack a cause of action, and its claim that this is an improper "programmatic challenge" are likewise unavailing.  Congress has explicitly waived sovereign immunity for claims against the government seeking nonmonetary relief, and this case involves precisely the kind of threatened agency action that this Court has already held falls within that waiver.  And contrary to what the SEC repeatedly (and inexplicably) asserts, Plaintiffs' claims do not arise under the Administrative Procedure Act ("APA").  Plaintiffs' claims rely on the Declaratory Judgment Act and the courts' inherent power to enjoin unlawful government action.  While the Declaratory Judgment Act does not itself create a cause of action, it entitles a plaintiff to bring suit to litigate the cause of action that the declaratory defendant would otherwise have against the plaintiff.  As the SEC's enforcement actions against other entities demonstrate, the SEC has indisputably claimed a cause of action to sue entities that engage in the kind of conduct at issue here (operating a platform that facilitates the bare purchase and sale of typical digital assets on the secondary market).  And Plaintiffs do not challenge the SEC's exercise of enforcement discretion or its entire enforcement program; their claims target only the imminent threat that the SEC will bring enforcement actions against LEJILEX and similarly situated CFAT members.

There is a reason the SEC puts so much effort into its threshold objections:  It has nothing persuasive to say on the merits.  While the SEC accuses Plaintiffs of trying to create a digital asset carve-out from the securities laws, that is not and has never been Plaintiffs' argument.  This case is about one, and only one, type of digital asset transaction: bare sales in which the only right the purchaser acquires is ownership of the digital asset itself.  The securities laws do not cover such transactions for the simple reason that they do not involve securities.  The SEC insists that it can regulate those transactions notwithstanding the fact that they lack the core feature of an

"investment contract"—namely, a reciprocal arrangement in which the investor contributes capital and the promoter or a third party in turn takes on an obligation to use that capital in a common enterprise to generate returns that the investor will share.  But that argument is foreclosed by Supreme Court precedent dating back more than 75 years and would give the SEC sweeping power over countless transactions in all kinds of assets that one might purchase in hopes that their value will rise through the efforts of others.  This Court should reject the SEC's regulatory overreach, deny its motions to dismiss and for summary judgment, and grant summary judgment for Plaintiffs.

## BACKGROUND

Digital assets are essentially computer code entries on blockchains that record the owner's right to access an application or service on a computer network.  Dkt.36 ("App.") at 1 (Wawszczak Decl. ¶2).  Once issued by its developer, a digital asset can be traded on a secondary trading platform.  *See* App.2 (Wawszczak Decl. ¶4).  The digital asset's creator typically is not involved in these secondary transactions, and they entail no ongoing promises, either between the parties or by the asset's creator.  App.2 (Wawszczak Decl. ¶4).  Instead, these secondary-market transactions simply transfer the digital assets at issue in exchange for other consideration, much as two parties might trade any other type of asset or commodity.

LEJILEX is a Texas corporation that is developing a new digital asset trading platform called the Legit.Exchange, which will enable its users to engage in secondary-market transactions in certain digital assets. App.1 (Wawszczak Decl. ¶2).  LEJILEX will not be developing or issuing any digital assets of its own or facilitating any primary issuances of digital assets by others.  App.3 (Wawszczak Decl. ¶9).  Instead, its trading platform will allow users to engage only in peer-to-peer secondary transactions—that is, purchases and sales of already-issued digital assets, in which one user will sell a digital asset to another in exchange for a different digital asset or a fiat currency like U.S. dollars.  App.2-3 (Wawszczak Decl. ¶¶4, 9-10).  Those transactions will be structured as

blind bid/ask trades, meaning that buyers and sellers will not know who is on the other side of a transaction.  App.2 (Wawszczak Decl. ¶5).

LEJILEX will approve trading on its platform only in digital assets that do not involve a traditional investor/investee relationship—i.e., digital assets that do not carry with them any ongoing interest in a common profit-sharing enterprise that their issuer or seller must manage on their purchasers' behalf, such as MANA, POWR, RGT, RLY, SAND, DASH, XYO, and ETH.  *See* App.2-3 (Wawszczak Decl. ¶¶7-8).  LEJILEX will not permit trading on its platform in any of the rare digital assets that carry with them those kinds of ongoing obligations, such as digital assets representing a share of stock.  App.2 (Wawszczak Decl. ¶7).

LEJILEX has the technical capability to make the Legit.Exchange available to the public.  App.3-4 (Wawszczak Decl. ¶13).  But LEJILEX has refrained from launching the Legit.Exchange because of the risk that doing so would subject LEJILEX to an unlawful SEC enforcement action.  App.3 (Wawszczak Decl. ¶12).  The SEC has already brought several enforcement actions against other digital asset trading platforms, such as Coinbase, Binance, and Kraken, for facilitating secondary-market transactions in digital assets—including digital assets that LEJILEX will make available for trading on its platform—on the theory that those transactions constitute securities transactions.  App.3 (Wawszczak Decl. ¶12); *see* Dkt.35 ("Pltfs.MSJ.") at 15-17.  That is, the SEC has already brought enforcement actions against other entities for doing precisely what LEJILEX will do when it launches the Legit.Exchange, underscoring the substantial and imminent threat that LEJILEX will face an SEC enforcement action if it launches its platform.  App.3 (Wawszczak Decl. ¶12).  LEJILEX has accordingly brought this suit for declaratory and injunctive relief to ensure that launching its platform will not subject it to an unlawful SEC enforcement action and significant liability under the federal securities laws.

4

CFAT is a nonprofit organization that advocates for the responsible development of digital asset policies in Texas.  App.5 (Quintenz Decl. ¶2).  Its members include LEJILEX and other companies who operate or will operate platforms that facilitate secondary-market digital asset transactions, and so face a clear and imminent threat of unlawful SEC enforcement actions.  App.7 (Quintenz Decl. ¶7).  CFAT and its members have a clear interest in ensuring that important opportunities for perfectly legitimate digital asset commerce are not foreclosed by the imminent threat of SEC enforcement actions.

Plaintiffs' suit seeks relief specifically targeted at eliminating that imminent and unlawful threat.  In particular, Plaintiffs ask this Court to declare that "secondary-market sales of digital assets like the ones that LEJILEX intends to facilitate through the Legit.Exchange"—i.e., sales of digital assets that do not represent an interest in any common profit-sharing enterprise or carry with them any ongoing obligations on the part of their seller or creator—"are not sales of securities" under the federal securities laws, meaning that "the Legit.Exchange is not an unregistered securities exchange" and that "operating the Legit.Exchange will not make LEJILEX an unregistered broker" or "an unregistered clearing agency."  Dkt.1 ("Compl.") ¶94(a)-(d).  And Plaintiffs ask the Court to enjoin the SEC "from bringing an enforcement action against LEJILEX or similarly situated CFAT members"—i.e., CFAT members who operate digital asset platforms that facilitate trading only in the kind of digital assets described above—"premised on any purported failure to register as securities exchanges, brokers, or clearing agencies."  Compl. ¶94(e).

## ARGUMENT

## I.    This Court Can And Should Decide The Merits Of This Case.

In a transparent attempt to avoid review on the merits, the SEC puts forward a passel of threshold objections to Plaintiffs' claims, asserting that Plaintiffs lack standing, that their suit is unripe, that Defendants are protected by sovereign immunity, that Plaintiffs lack a cause of action,

5

that the suit is an impermissible "programmatic challenge," and (if all else fails) that this Court should just dismiss the case in an exercise of "discretion."  None of those objections is persuasive. LEJILEX and other CFAT members face an imminent threat of an unlawful SEC enforcement action for engaging in conduct that the SEC has no authority to regulate, and Plaintiffs are entitled to seek declaratory and injunctive relief to eliminate that imminent threat.  The fact that LEJILEX has not yet engaged in that conduct—because it does not want to risk liability without first establishing the legality of its actions—just makes this case a typical pre-enforcement challenge. This Court should reject the SEC's motley assortment of threshold objections and proceed to the merits.

### A.      Plaintiffs' Claims Are Justiciable.

To begin with, this case falls squarely within the boundaries of Article III and this Court's jurisdiction.  The SEC's standing and ripeness challenges parallel arguments that this Court and the Fifth Circuit have recently rejected, *see Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 594-98 (N.D. Tex. 2021) (O'Connor, J.), *aff'd in relevant part sub nom. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 923-32 (5th Cir. 2023), and they fail here for the same reasons.  When the government has already made clear that it believes that particular conduct is proscribed—and has already brought suit against numerous others for engaging in that same conduct—Article III "do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

### 1.      Plaintiffs have Article III standing.

To have standing to invoke the jurisdiction of an Article III court, a plaintiff must face an injury that is (1) "concrete and particularized" and "actual or imminent," (2) "fairly traceable to the defendant's allegedly unlawful conduct," and (3) "likely to be redressed by the requested relief."  *Braidwood*, 70 F.4th at 924.  The SEC does not contest the second and third elements; it

instead contests only the first, claiming that the "threat" of an SEC "enforcement action" against LEJILEX is not "sufficiently imminent" because LEJILEX has not yet launched its platform. Dkt.31 ("Defts.MTD") at 20-21; *see* Dkt.38 ("Defts.MSJ") at 7.

That is the same argument that this Court and the Fifth Circuit rejected in *Bear Creek*. In that case, a nondenominational Christian church and a Christian-owned private business sued the EEOC seeking a declaration that federal law did not prohibit them from exercising their sincerely held religious beliefs by refusing to hire gay or transgender employees. *Bear Creek*, 571 F.Supp.3d at 585-89. Like the SEC here, the EEOC moved for summary judgment on standing, ripeness, and sovereign immunity grounds. *Id.* at 593-94. And like the SEC here, the EEOC argued that the *Bear Creek* plaintiffs lacked standing because the EEOC had "taken no enforcement action against [them]," and they had not yet "taken any adverse employment action" that could subject them to one. *Braidwood*, 70 F.4th at 924.

This Court squarely rejected those arguments. In a pre-enforcement action, the Court explained, a plaintiff "need not show a specific threat of enforcement directed at him personally before seeking declaratory relief"; after all, "the entire point of a pre-enforcement challenge is to allow courts to rule on the legality of a plaintiff's conduct *before* an enforcement action is brought." *Bear Creek*, 571 F.Supp.3d at 594-95 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Instead, "to establish Article III standing," a plaintiff need only show that it faces "a 'credible fear' of enforcement" if it engages in its proposed conduct. *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014)). The *Bear Creek* plaintiffs met that standard, this Court held, by showing that the EEOC was "willing to pursue actions against employers that do not comply with its view of [the law]"—in particular, by pointing to a prior EEOC enforcement action against

an employer who engaged in the same basic conduct, as well as EEOC guidance documents deeming that conduct prohibited. *Id.* at 597; *see id.* at 595-96.

The Fifth Circuit affirmed in relevant part. Like this Court, the Fifth Circuit explained that plaintiffs "are not required to violate the law and expose themselves to potential penalties" just to establish Article III standing; "they merely need to show" a "credible threat or well-founded fear" that if they do engage in the conduct at issue, they "will face enforcement actions." *Braidwood*, 70 F.4th at 925. And like this Court, the Fifth Circuit found that the *Bear Creek* plaintiffs "readily establish[ed] a credible threat"—especially in light of the prior EEOC enforcement action against another business that engaged in similar conduct. *Id.* at 927. Given the existing EEOC guidance and the history of EEOC enforcement, the plaintiffs were "entitled to receive clarification" through a declaratory judgment action "before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action." *Id.* at 927-28.

That same reasoning compels the same conclusion here. Just as in *Bear Creek*, "[i]t is clear that the [SEC] is willing to pursue actions against [platforms] that do not comply with its view" of how the federal securities laws apply to digital assets. *Bear Creek*, 571 F.Supp.3d at 597. In fact, the SEC has already brought multiple enforcement actions against other entities for engaging in the same conduct that LEJILEX seeks to engage in (i.e., operating a platform for secondary-market digital asset transactions without first registering with the SEC). *See, e.g.*, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023); *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023); *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. filed Nov. 20, 2023); *see also* App.3 (Wawszczak Decl. ¶12) (explaining that "the SEC has already brought enforcement actions against other entities for doing precisely what LEJILEX will do when it launches the Legit.Exchange"); Dkt.47-1 ("Coinbase Amicus Br.") at 11-13. That makes this case

even easier than *Bear Creek*, where there had been only one prior enforcement action.  *A fortiori*, "there can be no serious dispute that" the SEC's repeated practice of "actively enforcing" the securities laws "in situations like Plaintiffs'" gives rise to "a credible fear of [SEC] enforcement" should Plaintiffs engage in the same conduct.  *Bear Creek*, 571 F.Supp.3d at 596.

Like the EEOC guidance in *Bear Creek*, moreover, the SEC's public statements reinforce that fear, as the SEC has made clear repeatedly that it believes that "for the most part" digital asset trading platforms "are non-compliant with the federal securities laws."  Chair Gary Gensler, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products*, U.S. Securities and Exchange Commission (Jan. 10, 2024), http://tinyurl.com/4jmzwy3d.  The undisputed public record thus confirms beyond doubt that LEJILEX faces a credible threat of an SEC enforcement action should it proceed with its intended course of conduct, and so does not have to risk liability by engaging in that conduct just to establish Article III standing to seek declaratory and injunctive relief.  *See Braidwood*, 70 F.4th at 928 ("[E]ven a public announcement to enforce a statute and one prior proceeding are sufficient for standing." (quotation marks and brackets omitted)); *Driehaus*, 573 U.S. at 158-59 ("[W]hen the threatened enforcement of a law creates an Article III injury … an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.").

With no persuasive response to *Bear Creek*, the SEC relegates it to a footnote, where it observes only that the EEOC in *Bear Creek* had "already admitted that [plaintiffs'] specific policies violate[d] its guidance," and that the case involved a First Amendment challenge.  Defts.MTD.20-21 n.5 (brackets in original) (quoting *Braidwood*, 70 F.4th at 931)  As to the first point, the SEC has already made its position clear by bringing enforcement action after enforcement action against others engaged in the same conduct LEJILEX has proposed, and it conspicuously never disavows

9

any intent to bring an enforcement action against LEJILEX should LEJILEX proceed to engage in that same conduct.  The SEC cannot evade pre-enforcement review by refusing to formally admit what is plainly its position.  As to the second point, while this case does not involve a First Amendment challenge, the principle that Article III "do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat," *MedImmune*, 549 U.S. at 128-29, has never been confined to constitutional claims.

The arguments in the body of the SEC's brief are foreclosed by *Bear Creek* itself.  The SEC insists that Plaintiffs cannot "premise their standing on the Commission's claims in *other* federal courts that *other* entities violated the federal securities laws."  Defts.MTD.20.  But that is precisely what the Fifth Circuit found sufficient to show a credible threat of enforcement in *Bear Creek*.  *See Braidwood*, 70 F.4th at 927.  The SEC asserts (without citation) that "there is no standing to seek judicial review of an agency's interpretation of a concededly valid statute before that interpretation results in even preliminary steps that could lead to an enforcement action related to the plaintiff."  Defts.MTD.20; *see* Defts.MSJ.7.  But again, that describes to a T what the Fifth Circuit found *did* suffice to show standing in *Bear Creek*.  *See Braidwood*, 70 F.4th at 924 (finding standing even though the EEOC "has taken no enforcement action against these plaintiffs").  Finally, the SEC complains that "Plaintiffs' complaint speaks generally of business operations that may … occur in the future" since LEJILEX has not yet launched its platform (to avoid drawing an SEC enforcement action).  Defts.MTD.21.  But that will virtually always be the case in pre-enforcement actions, so that argument once again runs head-on in the Supreme Court's admonition that Article III does not "require, as a prerequisite to testing the validity of the law … that the plaintiff bet the farm, so to speak, by taking the violative action."  *MedImmune*, 549 U.S. at 129.  And while the threat of future enforcement can be "case- and fact-specific," *Braidwood*, 70 F.4th

at 928, the relevant facts here are clear:  LEJILEX has attested in its complaint and supporting declarations that it intends to engage in exactly the same conduct that the SEC has *already challenged* in several pending enforcement actions.  *See* App.3 (Wawszczak Decl. ¶12).  The SEC offers no reason to doubt the veracity of those attestations, and they "readily establish" a credible threat of enforcement sufficient to demonstrate Article III standing.  *Braidwood*, 70 F.4th at 927.

### 2. Plaintiffs' claims are ripe.

Plaintiffs' claims are fully ripe—and for much the same reasons, as "there is a fair amount of overlap between Article III standing requirements and the ripeness analysis."  *Braidwood*, 70 F.4th at 930.  Indeed, "[i]t remains unclear" whether a court can ever "reject a claim as unripe once plaintiffs have established Article III standing."  *Id.* at 930 & n.28.  But here as in *Bear Creek*, it "is unnecessary to delve deeply" into that issue, "because [P]laintiffs' claims are ripe in any event." *Id.*  To determine ripeness, "a court must look at two factors": "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'"  *Id.* at 930 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *see Bear Creek*, 571 F.Supp.3d at 597.  Both of those factors confirm that Plaintiffs' suit is ripe.

1. A claim is "fit for judicial decision" if it "presents a pure question of law that needs no further factual development."  *Braidwood*, 70 F.4th at 930 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987)); *see Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985) (finding ripeness where the issue presented "is purely legal, and will not be clarified by further factual development").  That is this case.  Plaintiffs' claims present a straightforward legal issue: whether the SEC has statutory authority to regulate the purchase and sale of digital assets that do not entail any ongoing obligations to manage a common profit-sharing enterprise for the benefit of purchasers.  Compl. ¶¶1-2, 59-62, 64-84, 87-91; Pltfs.MSJ.1-3, 22-48; *see* App.2 (Wawszczak Decl. ¶7) (explaining that LEJILEX's platform

will not permit transactions in any digital asset that "represents or conveys any form of legal or equitable interest in any such enterprise or obligations").  That is a purely legal issue about the scope of the SEC's regulatory authority that turns on a classic question of statutory construction— namely, how to interpret the term "investment contract" in the securities laws.  *See Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 311 (5th Cir. 2021) (issues that "are predominantly questions of statutory interpretation" are "pure legal issues").  No further factual development is needed to resolve that question—as the SEC has recognized by bringing enforcement actions against other entities for the very same conduct in which LEJILEX wishes to engage.  *See Braidwood*, 70 F.4th at 931 (finding no further factual development necessary when EEOC had already "brought a successful suit against another violator for the same policies").

None of the SEC's contrary arguments is persuasive.  The SEC insists that Plaintiffs' claims are not ripe because they depend on "facts that do not yet exist."  Defts.MTD.14.  But the relevant facts—that LEJILEX currently plans to engage in a business that the SEC currently thinks is unlawful—already exist.  And the Fifth Circuit in *Bear Creek* rejected the same "near talismanic mantra that 'further factual development' would 'significantly advance' this court's ability to resolve plaintiffs' claims."  *Braidwood*, 70 F.4th at 931.  Here as in *Bear Creek*, "no more factual detail is required to resolve the claims that [Plaintiffs] present," *id.*, as LEJILEX has made abundantly clear how it "will operate," Defts.MTD.13.  It will permit transactions only in digital assets that do not entail any ongoing obligation to manage any common profit-sharing enterprise for the benefit of purchasers.  To eliminate any doubt about what that means, LEJILEX has identified specific digital assets that it plans to permit on its exchange—which are all assets that the SEC has already elsewhere opined give rise to "investment contracts" subject to SEC regulation when bought and sold in secondary-market transactions.  App.2-3 (Wawszczak Decl.

¶¶7-8) (explaining that LEJILEX will permit trading in "digital assets that the SEC has elsewhere claimed are 'securities,' including MANA, POWR, RGT, RLY, SAND, DASH, XYO, and ETH"); *see* Compl. ¶¶59, 61, 88.  And LEJILEX has explained that transactions on the Legit.Exchange will be identical in all material respects to secondary-market transactions on other exchanges that the SEC has already sued.  App.2-3 (Wawszczak Decl. ¶¶4-12); *see* Compl. ¶¶58-62.  The SEC does not (and cannot) explain why it believes that courts are capable of resolving whether those transactions constitute "investment contracts" when the SEC brings an enforcement action, but suddenly lack the ability to do so when the SEC is the defendant.  *Cf. Braidwood*, 70 F.4th at 931 (rejecting as "much too narrow" the view that "any injury is abstract and hypothetical" until the government "has brought an action against [the plaintiffs]").

The SEC protests that it does not know for certain each and every digital asset that LEJILEX will permit.  Defts.MTD.14.  But the SEC does not question the veracity of Plaintiffs' repeated representations that LEJILEX will permit transactions only in digital assets that entail "no ongoing commitments or obligations of any kind."  App.2 (Wawszczak Decl. ¶7); *see also* Compl. ¶59.  And Plaintiffs seek relief only as to transactions involving those kinds of assets, so if LEJILEX (or any other CFAT member) ever did reverse course and permit trading in assets that *do* entail such obligations, then the relief Plaintiffs have sought would not protect Plaintiffs or bind the SEC.  Resolving this case thus does not require a list of "all the digital assets that may eventually be traded" on the Legit.Exchange, *contra* Defts.MTD.14, just as deciding *Bear Creek* did not require a list of all the "precise employment practices" that might be "applied to particular individual employees" by the plaintiffs in "particular employment decisions" in the future, *Braidwood*, 70 F.4th at 931.  All this Court must do is decide whether the SEC has authority to

regulate the transactions that LEJILEX *does* wish to facilitate—which the SEC does not and cannot deny it thinks it does.

Ultimately, the SEC's ripeness argument conflates jurisdiction and the merits. To be sure, *the SEC* thinks that knowing more about digital assets than whether they entail any ongoing obligations to manage a common profit-sharing enterprise for the benefit of purchasers would be useful to determining whether transactions in those assets constitute "investment contracts." But that is because the SEC does not agree with Plaintiffs' view of the law. The SEC thinks that a digital asset transaction can give rise to an "investment contract" even if the issuer or seller undertakes no obligation to work to increase the value of the asset or to share any profits from any value-increasing activities it does undertake with purchasers. *See, e.g.*, Complaint ¶62, *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. filed Nov. 20, 2023), Dkt.1 (arguing that digital asset transactions can be investment contracts based solely on the buyer's expectations); *id.* ¶¶63, 66, 228, 235, 237, 255 (similar); Complaint ¶¶18, 126, 133, 145, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023), Dkt.1 (similar); Complaint ¶¶370, 382, 389, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023), Dkt.1 (similar); *see also* Pltfs.MSJ.37-39. If that were the correct view of the law, then that may well be a reason to deny Plaintiffs the relief they seek *on the merits*. But it is not a basis for refusing to reach the merits when the whole question in this case is whose view of the securities laws is correct. Plaintiffs have alleged all the facts necessary to entitle them to relief if *their view* of the law is right. The SEC's real argument thus is not that this case is unfit for judicial resolution, but simply that it thinks Plaintiffs are wrong about the law. The SEC is certainly entitled to make that argument on the merits, but it has nothing to do with ripeness.

In short, this case is nothing like a challenge to a non-self-executing administrative subpoena, *see Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016), or a suit by a prisoner seeking "a declaratory judgment as to the validity of a defense the State may, or may not, raise in a habeas proceeding," *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998), or a suit raising an abstract legal question without seeking "a judgment that the [defendant agency] is without power to enter any specific order or take any concrete regulatory step," *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952), when the possibility that the legal issue presented may arise in a future proceeding is purely speculative.  Plaintiffs seek declaratory and injunctive relief to ensure that LEJILEX can launch its digital asset trading platform without facing an unlawful enforcement action like the ones that the SEC has already brought against other companies for the same conduct. App.3 (Wawszczak Decl. ¶12); *see* Compl. ¶¶52-57; Pltfs.MSJ.15-18.  Against that backdrop, the SEC's claim that resolving this case would "improperly intrude[] into the agency's decisionmaking process," Defts.MTD.13 (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986)), rings hollow.  The only thing resolving this case would interfere with is the SEC's palpable desire to litigate challenges to its regulatory overreach at the time and in the forum of its choosing.

2. Plaintiffs would face substantial hardship if this Court were to abjure its "virtually unflagging obligation … to exercise [its] jurisdiction," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and refuse to hear their claims unless and until they actually engage in conduct that the SEC claims is unlawful.  As the Fifth Circuit explained in *Bear Creek*, "the correct analysis principally tracks the Article III injury analysis," and "[t]he *in terrorem* effects from the [SEC's] guidance and a credible prosecution risk are sufficient."  *Braidwood*, 70 F.4th at 931.  Absent judicial review of their claims, Plaintiffs will be forced into "the choice between abandoning [their] rights or risking prosecution"—the "'dilemma that it was the very

purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune*, 549 U.S. at 129 (quoting *Abbott Labs.*, 387 U.S. at 152). That hardship suffices to show ripeness. *See Braidwood*, 70 F.4th at 931-32; *Bear Creek*, 571 F.Supp.3d at 598. Indeed, it is hard to imagine a clearer case of substantial hardship than the dilemma facing someone hoping to launch a business that a regulator thinks is unlawful.

The SEC has no persuasive response. It entirely ignores this Court's and the Fifth Circuit's decisions in *Bear Creek* and the hardship that those decisions recognized when plaintiffs are forced to choose between refraining from their intended conduct or "putting themselves in danger of a costly enforcement action." *Braidwood*, 70 F.4th at 931; *see Bear Creek*, 571 F.Supp.3d at 598. The SEC instead invokes an irrelevancy, arguing that Plaintiffs suffer no hardship from "complaints filed against other entities" in prior enforcement actions. Defts.MTD.18. But Plaintiffs' hardship does not flow from those prior enforcement actions against other entities; it flows from the "credible … risk" that the SEC will bring a similar enforcement action *against LEJILEX itself* when LEJILEX launches its platform, *Braidwood*, 70 F.4th at 931, which unquestionably affects LEJILEX's "primary conduct," *contra* Defts.MTD.18 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003)). Plaintiffs "do[] not have to await the consummation of [that] threatened injury" for their suit to be ripe. *Braidwood*, 70 F.4th at 932 (quoting *Union Carbide*, 473 U.S. at 581).

The SEC closes with the extraordinary claim that Plaintiffs face "no cognizable hardship" because they "can raise all of their arguments in any eventual enforcement action." Defts.MTD.18-19. Again, that position cannot be reconciled with *Bear Creek*, where both this Court and the Fifth Circuit rejected exactly that argument. *Braidwood*, 70 F.4th at 931-32; *Bear Creek*, 571 F.Supp.3d at 598. Indeed, accepting that argument would make *every* declaratory

judgment action unripe, since virtually by definition a declaratory judgment plaintiff could always raise its arguments later in a future action against it. *See Braidwood*, 70 F.4th at 932 (plaintiffs can seek declaratory judgment when "the defendant in [the] declaratory judgment suit can sue the plaintiff"). That is not the law, and none of the SEC's cases remotely suggests otherwise. *See, e.g.*, *Walmart*, 21 F.4th at 313 (finding suit unripe where enforcement action was already pending); *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325, 337-39 (5th Cir. 2017) (finding suit unripe where enforcement action was already pending and plaintiff conceded that agency was "authorized to conduct a proceeding regarding the alleged violation and penalty"); *AT&T Corp. v. FCC*, 349 F.3d 692, 702 (D.C. Cir. 2003) (finding suit unripe where the "only hardship asserted" was the burden of ongoing litigation against a third party, not a threatened government enforcement action). Here as in *Bear Creek*, Plaintiffs "remain under a constant threat that government officials will use their power to enforce the law against them" if Plaintiffs engage in the conduct at issue. *Braidwood*, 70 F.4th at 932 (quotation marks omitted). Plaintiffs' claims accordingly "are ripe." *Id.*

### B.    Plaintiffs' Claims Are Not Barred by Sovereign Immunity.

Plaintiffs' claims are not barred by sovereign immunity, for all the reasons that this Court explained in rejecting the EEOC's similar argument in *Bear Creek*—a holding that the government did not even attempt to appeal. 571 F.Supp.3d at 598-99; *see Braidwood*, 70 F.4th at 921 n.5. Like the plaintiffs in *Bear Creek*, Plaintiffs here assert non-APA causes of action seeking declaratory and injunctive relief to address a clear and imminent threat of agency enforcement. As this Court correctly held in *Bear Creek*, those kinds of claims are squarely covered by the waiver of sovereign immunity in 5 U.S.C. §702. The SEC cannot defeat that conclusion by trying to convert Plaintiffs' claims into APA claims that they did not bring.

17

1. Congress enacted §702 in 1976 "to waive sovereign immunity in most suits for nonmonetary relief." *Bear Creek*, 571 F.Supp.3d at 598. As relevant here, §702 provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. §702. As the plain statutory text indicates, that waiver "is not limited to suits under the Administrative Procedure Act"; it also "serves as a waiver of sovereign immunity in suits seeking nonmonetary relief for a cause of action that originates outside of the APA." *Bear Creek*, 571 F.Supp.3d at 598-99 (citing *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014)). Under Fifth Circuit precedent, to invoke that waiver, a plaintiff must (1) "identify some 'agency action' affecting him in a specific way, which is the basis of his entitlement for judicial review," and (2) "show that he has 'suffered legal wrong because of the challenged agency action, or is adversely affected or aggrieved by that action within the meaning of a relevant statute.'" *Id.* at 599 (quoting *Ala.-Coushatta Tribe*, 757 F.3d at 489).[1] "[W]hen judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA," there is "no requirement of finality for this type of waiver to apply." *Id.* (quoting *Ala.-Coushatta Tribe*, 757 F.3d at 489). That is, plaintiffs bringing a non-APA cause of action "are not required to establish 'final agency action' for the Section 702 waiver to apply." *Id.*

---

[1] As the Fifth Circuit has recognized, "[m]ost circuits that have considered the issue" hold that §702 waives sovereign immunity "in all suits seeking equitable, nonmonetary relief," regardless of whether the plaintiff challenges a particular agency action. *Walmart*, 21 F.4th at 307. Although the Fifth Circuit has held otherwise, Plaintiffs respectfully submit that the majority view is correct and preserve this issue for further review if necessary.

Applying that framework, this Court held in *Bear Creek* that the plaintiffs' suit for declaratory relief was covered by the waiver of sovereign immunity in §702. As to the first requirement, "[t]he EEOC's guidance documents and its [prior] enforcement action … are 'agency actions.'" *Id.* And as to the second requirement, the plaintiffs "ha[d] been 'adversely affected' by the threat of agency action" because they "ha[d] successfully demonstrated a credible fear of enforcement" based on the EEOC's prior enforcement action against another entity for the same conduct. *Id.* Because plaintiffs "satisfied both requirements under §702," their suit was not barred by sovereign immunity. *Id.*

That analysis leads to precisely the same result here. First, Plaintiffs have identified agency actions in the form of agency statements declaring the conduct at issue unlawful and multiple prior enforcement actions against other entities engaged in the same conduct. *See* App.3 (Wawszczak Decl. ¶12); Compl. ¶¶49, 52-57, 62; Pltfs.MSJ.15-18. And here as in *Bear Creek*, Plaintiffs bring non-APA causes of action—a declaratory judgment action based on the SEC's own statutory causes of action, and a traditional equitable cause of action to enjoin unlawful executive conduct— so finality is not required. *Bear Creek*, 571 F.Supp.3d at 598-99; *see infra* pp.24-26. Second, Plaintiffs have successfully demonstrated a credible fear of enforcement based on the SEC's prior enforcement actions against others engaged in the same conduct, *see supra* pp.8-9, and so "have been 'adversely affected' by the threat of agency action." *Bear Creek*, 571 F.Supp.3d at 599. Section 702 therefore waives sovereign immunity with respect to Plaintiffs' claims.

2. The SEC does not take issue with the analysis that this Court laid out in *Bear Creek* or question whether that the decision is good law. *See* Defts.MTD.9-10. Instead, it offers three purported distinctions between this case and *Bear Creek*. None succeeds.

First, the SEC contends that Plaintiffs "invoke only the APA" as the basis for their claims, and so must show final agency action to rely on §702.  Defts.MTD.9; *see* Defts.MTD.7-8.  That is flatly incorrect.  Plaintiffs' complaint does not "invoke … the APA" at all, *contra* Defts.MTD.9—other than citing the waiver of sovereign immunity in §702, which applies equally to "causes of action that arise outside of the APA," *Bear Creek*, 571 F.Supp.3d at 599.  Plaintiffs bring two such non-APA causes of action, one seeking declaratory relief and one seeking injunctive relief.

As to the former, Plaintiffs here (like the plaintiffs in *Bear Creek*) rely on the Declaratory Judgment Act, *see* Compl. ¶86, which does not "provide an independent cause of action"; instead, "'it is the underlying cause of action of the defendant against the plaintiff that is actually litigated,'" *Braidwood*, 70 F.4th at 932-33 (quoting *Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("*HAVEN*")); *see also, e.g.*, *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("[T]he underlying cause of action which is thus actually litigated is the declaratory defendant's[.]"); *Neese v. Becerra*, 640 F.Supp.3d 668, 685 (N.D. Tex. 2022) ("In a declaratory-judgment action, the relevant cause of action is the defendant's anticipated lawsuit against the plaintiff."); Defts.MSJ.8 (recognizing as much).  Plaintiffs' declaratory judgment claim accordingly does not rest on the APA (and, indeed, has nothing to do with the APA); it rests on the non-APA statutes under which the SEC would bring its own enforcement action against LEJILEX.  *See* Compl. ¶¶94(a)-(d) (citing 15 U.S.C. §§78e, 78o(a), 78q-1(b)(1)); *see also* 15 U.S.C. §§77t(b), 78u(d)(1).

Plaintiffs' claim for injunctive relief likewise has nothing to do with the APA.  It instead rests on the traditional equitable cause of action "to enjoin unlawful executive action," which "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *see* Compl. ¶92;

20

Defts.MSJ.6 (conceding that Plaintiffs "do not allege an APA cause of action").  Because Plaintiffs

do not seek relief under the APA, they "are not required to establish 'final agency action,'" and the

SEC's attempt to distinguish *Bear Creek* on that basis fails.  571 F.Supp.3d at 599; *contra*

Defts.MTD.7-9; Defts.MSJ.6.

Second, the SEC notes that the EEOC in *Bear Creek* did not dispute that the plaintiffs'

policies contravened its view of the law, whereas here the SEC claims that it "has not determined

… that LEJILEX has violated the federal securities laws."  Defts.MTD.9-10.  The SEC does not

explain how that purported distinction would affect the sovereign-immunity analysis—and it is

wrong in any event, as the SEC has already made clear that it considers LEJILEX's intended

conduct unlawful, including by bringing enforcement actions against others for the same conduct.

*See supra* pp.8-10.

Third, the SEC claims that this case seeks "wholesale review" of its "'enforcement

practices' as to digital assets," while apparently suggesting that *Bear Creek* involved a narrower

challenge.  Defts.MTD.10.  That is wrong twice over:  Plaintiffs challenge the SEC's statutory

authority to regulate the conduct in which LEJILEX and other CFAT members wish to engage, not

the agency's enforcement practices, *see infra* pp.23-24, and their challenge is no broader than the

*Bear Creek* plaintiffs' equally categorical assertion that employers "are permitted to refrain from

employing those who engage in conduct that violates their sincerely held religious beliefs," 571

F.Supp.3d at 586.  *Bear Creek* thus confirms that §702 waives sovereign immunity here.

3. The SEC's remaining efforts to evade §702 are equally unavailing.  It begins by

contending that Plaintiffs have not identified any "'agency action' within the meaning of §702,"

such as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

failure to act." Defts.MTD.6 (quoting *Ala.-Coushatta Tribe*, 757 F.3d at 489-90); *see* 5 U.S.C.

§551(13) (defining "agency action").  But just as "[t]he EEOC's guidance documents and its [prior] enforcement action" qualified as agency actions in *Bear Creek*, the SEC's prior statements and its multiple enforcement actions qualify as well, as they assert obligations "that have not been established by federal law" and direct regulated parties "to comply with those interpretations." 571 F.Supp.3d at 599; *see Walmart*, 21 F.4th at 308 ("Agencies make rules when they announce principles of general applicability and future effect.").  And those actions *do* affect Plaintiffs "in a specific way," *contra* Defts.MTD.7 (quoting *Ala.-Coushatta Tribe*, 757 F.3d at 489), as they give rise to Plaintiffs' "credible fear of enforcement," *Bear Creek*, 571 F.Supp.3d at 599.  The SEC's contrary view—that "civil actions against other entities do not constitute agency action" under §702 as a matter of law, Defts.MTD.7—cannot be squared with *Bear Creek*.[2]

Plaintiffs have also adequately asserted agency action based on the imminent enforcement action that LEJILEX will face if it engages in the conduct at issue.  *See supra* p.19.  Unlike the plaintiff in *Walmart*, Plaintiffs are not asserting that mere "threats" of future enforcement "designed to compel compliance" should qualify as an agency "sanction."  21 F.4th at 310.  It is the forthcoming enforcement action *itself* that qualifies as agency action under §702, as "part of an agency … imposition of penalty or fine" through the judicial process.  5 U.S.C. §551(10) (defining "sanction").  And the SEC's attempt to portray a future enforcement action against LEJILEX as "mere conjecture regarding what the [SEC] might someday do," Defts.MTD.7, is no more persuasive here than in the standing context—particularly given the agency's history of bringing enforcement actions premised on the same conduct.  *See supra* pp.8-9.

---

[2] While an agency complaint itself may not "create rights or obligations" or have "future effect," the agency's "policy statements" reflected in its public pronouncements and enforcement proceedings are at a minimum "non-substantive rules."  *Walmart*, 21 F.4th at 309.

The SEC also contends that Plaintiffs "cannot show that they 'suffered legal wrong' on account of" agency action.  Defts.MTD.8.  But like the plaintiffs in *Bear Creek*, Plaintiffs "have been 'adversely affected' by the threat of agency action," which has prevented LEJILEX from launching its digital asset trading platform.  571 F.Supp.3d at 599; *see* App.3-4 (Wawszczak Decl. ¶¶12-13).  Again, the SEC has no response to this Court's straightforward analysis.

4. Last and least, the SEC asserts that Plaintiffs' claims challenge agency decisions about "whether to investigate and whether to bring enforcement actions" that are "committed to agency discretion by law."  Defts.MTD.10-11; *see* 5 U.S.C. §701(a)(2).  That argument is borderline frivolous.  The SEC may have substantial discretion to decide which investigations and enforcement actions to pursue in light of its "priorities and resource allocation."  Defts.MTD.10. But that discretion emphatically does not entitle the agency to bring enforcement actions that exceed its statutory authority, or to prevent judicial review of whether a threatened enforcement action exceeds that authority.  This suit does not challenge any agency "refusal to take requested enforcement action," which is "generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  It challenges the agency's threatened *exercise* of enforcement power beyond its statutory mandate.  And "when an agency *does* act to enforce"—or, as here, there is a credible threat that it will do so—"that action itself provides a focus for judicial review," and "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers."  *Id.* at 832; *see, e.g.*, *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) (same).

That is why, for instance, this Court and the Fifth Circuit had jurisdiction to decide in *Bear Creek* whether the EEOC could bring an enforcement action against the plaintiffs there, even though the EEOC "would have to exercise its discretion to pursue said action."  *Braidwood*, 70

23

F.4th at 926.  Unsurprisingly, the SEC cites no case holding that a court cannot review whether a threatened enforcement action exceeds an agency's authority just because the agency has "prosecutorial discretion" to decide whether to bring the action.  *Contra* Defts.MTD.10.  And cases embracing the opposite proposition are legion—including practically every reported pre-enforcement suit, since such suits almost by definition involve challenges to enforcement actions that the government has discretion not to undertake.  *See, e.g.*, *MedImmune*, 549 U.S. at 128-29 (describing pre-enforcement challenges to threatened government actions).  Put simply, an agency cannot preclude judicial review of whether a threatened enforcement action oversteps its authority by refusing to definitively say whether it will bring the action.

### C.    Plaintiffs Have Causes of Action for Declaratory and Injunctive Relief.

For similar reasons, the SEC fares no better with its argument that Plaintiffs have no cause of action to seek relief from the threat that the SEC will target them with an unlawful enforcement suit.  Plaintiffs have valid causes of action supporting both their request for declaratory relief and their request for injunctive relief.

1. Plaintiffs have sought declaratory relief under the Declaratory Judgment Act, which authorizes a federal court "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §2201(a).  As explained, the Act does not create its own cause of action; as the SEC recognizes, "[i]t is the underlying cause of action of the defendant against the plaintiff that is actually litigated" in a declaratory judgment action.  Defts.MSJ.8 (quoting *HAVEN*, 915 F.2d at 171); *see Braidwood*, 70 F.4th at 932-33; *Lowe*, 723 F.2d at 1179 (recognizing that the "underlying cause of action" in a declaratory judgment suit "is the declaratory defendant's"); *Neese*, 640 F.Supp.3d 668, 685 (N.D. Tex. 2022) (same); *supra* p.20.  As a result, "so long as the defendant in a declaratory judgment suit can sue the plaintiff for an action the defendant is responsible for (within the scope of the

24

proposed cause of action), the independent cause of action required for a declaratory judgment claim exists." *Braidwood*, 70 F.4th at 932.  That is precisely the situation here.  It is undisputed that the SEC would have a cause of action to sue Plaintiffs for purported violations of the federal securities laws just as they have already sued others (even if those suits should fail on the merits). *See* 15 U.S.C. §§77t(b), 78u(d)(1) (authorizing SEC enforcement actions); *id.* §§78e, 78o(a), 78q-1(b)(1) (requiring registration for exchanges, brokers, and clearing agencies).   Plaintiffs accordingly have "the independent cause of action required for a declaratory judgment claim" against the SEC.  *Braidwood*, 70 F.4th at 932.

Second, Plaintiffs have an equitable cause of action "to enjoin unlawful executive action," which is "a judge-made remedy" that "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327; *see, e.g.*, *United States v. Texas*, 97 F.4th 268, 275-76 (5th Cir. 2024); Compl. ¶¶92, 94(e).  The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief … with respect to violations of federal law by federal officials," including when those officials seek to exceed their statutory authority. *Armstrong*, 575 U.S. at 326-27; *see Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109-10 (1902) (finding injunctive relief proper where government action was "unauthorized by any law"); *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) (recognizing that, "in a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer"); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988))).  That settled authority

confirms that Plaintiffs have an independent equitable cause of action to seek injunctive relief against the SEC's threatened unlawful enforcement action.[3]

2. The SEC does not acknowledge Plaintiffs' equitable cause of action for injunctive relief. It instead focuses solely on their request for declaratory relief, arguing that Plaintiffs have no cause of action because their complaint "does not seek to litigate an underlying cause of action that the Commission has threatened to bring" or "seek a declaration as to whether specific conduct by plaintiffs violates the federal securities laws." Defts.MSJ.8-9.  That is plainly wrong.  Plaintiffs' complaint seeks very specific declaratory relief—namely, a declaration that "sales of digital assets like the ones that LEJILEX intends to facilitate through the Legit.Exchange are not sales of securities," that "the Legit.Exchange is not an unregistered securities exchange," that "operating the Legit.Exchange will not make LEJILEX an unregistered broker," and that "operating the Legit.Exchange will not make LEJILEX an unregistered clearing agency."  Compl. ¶¶94(a)-(d).  It is hard to imagine declaratory relief more narrowly tailored to specific conduct, or more obviously directed at the threat of a specific enforcement action.  *See, e.g.*, Compl. ¶¶88, 91 (explaining that "LEJILEX faces a genuine threat that the SEC will bring an enforcement suit against it if LEJILEX engages in its intended course of conduct," and that a "declaratory judgment action is therefore proper to allow LEJILEX to determine whether it will be able to conduct its business without risking the severe penalties that the SEC is currently seeking against Coinbase and others").

That suffices to defeat the SEC's hyperbolic claims that "[t]here is no limit" to Plaintiffs' requested relief, and that Plaintiffs seek "to 'free' the 'digital asset industry' from regulation" of

---

[3] The SEC notes that because SEC enforcement actions are brought by the SEC, not individual officials, Plaintiffs have a cause of action for declaratory relief against only the SEC itself. Defts.MSJ.9.  Plaintiffs' cause of action for injunctive relief, however, properly extends to all Defendants. *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002).

any kind.  Defts.MSJ.9.  Plaintiffs' position is straightforward:  The SEC has no statutory authority to regulate the bare purchase and sale of digital assets that do not entail any ongoing obligations to manage a profit-sharing enterprise for the purchaser's benefit, because those transactions are not securities transactions under the Securities and Exchange Acts.  *See* Pltfs.MSJ.22-48; *infra* pp.35-45.  The SEC therefore has no statutory authority to bring an enforcement action against LEJILEX or other CFAT members for facilitating those transactions, which are the only kind of transactions as to which Plaintiffs have sought relief.  App.2 (Wawszczak Decl. ¶7).  There is nothing "abstract" about that argument.  *Contra* Defts.MSJ.9-10.  It is the same argument that defendants in enforcement actions all over the country have been pressing when defending against the SEC's overreach campaign.  To be sure, accepting Plaintiffs' position "may ultimately have the effect" of forcing the SEC to rethink its broader regulatory approach "in order to avoid the unlawful result that the court discerns."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).  But that is true in virtually any case challenging agency action, whether offensively or defensively, and it does not begin to strip Plaintiffs of their cause of action to seek declaratory relief as to the specific threat of regulatory action that they face.

Once again, the flaws in the SEC's arguments are best illustrated by the Fifth Circuit's decision in the *Bear Creek* case—which the SEC once again relegates to a footnote, *see* Defts.MSJ.11 n.3.  As the SEC acknowledges, the Fifth Circuit there squarely held that "so long as the defendant in a declaratory judgment suit can sue the plaintiff for an action the defendant is responsible for (within the scope of the proposed cause of action), the independent cause of action required for a declaratory judgment claim exists."  Defts.MSJ.11 n.3 (quoting *Braidwood*, 70 F.4th at 932).  That holding applies with equal force here, and nothing in the Fifth Circuit's opinion remotely limits it to declaratory judgment actions based on "circumstances that had already

occurred" rather than future conduct.  *Contra* Defts.MSJ.11 n.3.  On the contrary, the plaintiffs in *Bear Creek* had *not* yet subjected any employee to an adverse employment action on grounds that the EEOC considered protected, *see Braidwood*, 70 F.4th at 926, making the circumstances there materially indistinguishable from the circumstances here.  *Bear Creek* thus confirms that Plaintiffs have a cognizable cause of action for declaratory relief.

### D.  Plaintiffs' Claims Raise a Discrete Pre-Enforcement Challenge, Not a Programmatic Challenge.

The SEC next charges Plaintiffs with raising "an improper programmatic challenge" rather than a discrete challenge to a specific agency action.  Defts.MTD.21.  Again, that mischaracterizes Plaintiffs' claims.  Plaintiffs are not challenging the SEC's administration of its enforcement policies generally; they are challenging the specific and imminent threat that the SEC will bring an enforcement action against LEJILEX when LEJILEX launches the Legit.Exchange, and/or against other CFAT members engaged in analogous conduct.  *See* Compl. ¶¶58-63, 87-93. That is exactly the kind of discrete pre-enforcement challenge to a particular threatened government action that courts resolve all the time, and that the Declaratory Judgment Act is designed to facilitate.  *See MedImmune*, 549 U.S. at 128-29.[4]

This case is accordingly nothing like *Lujan* and its progeny.  In *Lujan*, the plaintiff did not claim that it was facing any threat of any specific imminent government enforcement action or seek to challenge any such action; in fact, it did not focus its challenge on any particular government action at all.  Instead, it sought to challenge "the entirety of [the government's] so-

---

[4] As explained, *see supra* pp.18-19, the SEC is also wrong to suggest that Plaintiffs must "identify a discrete *final* agency action" to bring a proper pre-enforcement challenge. *Contra* Defts.MTD.21 (emphasis added).  *Lujan* and the other cases the SEC cites addressed APA claims, which do require final agency action.  *See* 5 U.S.C. §704.  But Plaintiffs bring non-APA claims, so "[f]inality is not necessary." *Bear Creek*, 571 F.Supp.3d at 599; *see supra* pp.18-19, 24-25.

called 'land withdrawal review program,'" which was the term it coined to "refer[] to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." *Lujan*, 497 U.S. at 890. The Court rejected that challenge, explaining that the plaintiff's allegations that "violation of the law is rampant within this program" were not directed at any particular agency action that had caused or threatened it with any harm, and that the plaintiff could not properly "seek wholesale improvement of this program by court decree." *Id.* at 891 (emphasis omitted). At the same time, the Court made clear that when a plaintiff *does* challenge a specific agency action that "has an actual or immediately threatened effect," that challenge is not barred even if judicial relief "may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns." *Id.* at 894; *see id.* at 890 n.2 (specific agency action "can of course be challenged under the APA by a person adversely affected," even if "the entire 'land withdrawal review program' … would thereby be affected").

This case presents exactly the kind of discrete challenge to a particular threatened agency action that *Lujan* deemed permissible. Unlike the plaintiffs in *Lujan* and the other cases the SEC cites, Plaintiffs here are not seeking open-ended judicial supervision and correction of numerous purported flaws in a general agency program. They are challenging the specific and imminent threat of an unlawful agency enforcement action against LEJILEX for engaging in lawful conduct. Compl. ¶¶87-93; App.3 (Wawszczak Decl. ¶12). That is worlds away from a general challenge to "the entirety of [the BLM's] 'land withdrawal review program,'" *Lujan*, 497 U.S. at 890, or the Forest Service's entire "'program' of timber management in the Texas forests … covering harvesting from the 1970s to timber sales which have not yet occurred," *Sierra Club v. Peterson*,

228 F.3d 559, 568 (5th Cir. 2000), or "decades of inaction" by the Army Corps of Engineers "in failing to keep [a canal] from expanding beyond the width authorized by Congress in 1942," *Louisiana v. United States*, 948 F.3d 317, 322 (5th Cir. 2020), or the entire "federal management of the natural resources on [certain] land," including "all of the leases, permits, and sales administered by multiple federal agencies," *Ala.-Coushatta Tribe*, 757 F.3d at 490.

The SEC complains that Plaintiffs' factual allegations are not narrowly limited to facts about Plaintiffs themselves, and instead also describe the history of digital assets and the SEC's campaign to extend its regulatory authority in this area. Defts.MTD.22-23 (citing Compl. ¶¶24, 46-57). But those allegations are critical to Plaintiffs' obligation to establish standing, as they confirm that the threat of an enforcement action is concrete and imminent. Unsurprisingly, the SEC cites no case remotely suggesting that including information about other relevant agency actions in a complaint somehow converts a suit seeking relief from specific threatened agency action into an impermissible programmatic challenge. And, of course, the fact that granting Plaintiffs relief "may ultimately have the effect" of requiring the SEC to abandon its broader effort to seize regulatory authority over digital asset transactions "to avoid the unlawful result that the court discerns," *Lujan*, 497 U.S. at 894, is no basis for refusing to resolve Plaintiffs' claims.

The SEC next complains that Plaintiffs' claims are not limited to "certain digital assets" or "certain digital-asset trading platforms." Defts.MTD.23-24. Again, that is not correct. To be sure, Plaintiffs may not have catalogued each and every digital asset or trading platform that the SEC has mistakenly claimed falls within its regulatory sphere. But Plaintiffs have very much confined their claims to a particular universe of digital asset transactions—namely, those that do not entail any ongoing obligations to manage a common profit-sharing enterprise for the purchaser's benefit. Pltfs.MSJ.22-48; *see, e.g.*, App.2 (Wawszczak Decl. ¶7); Compl. ¶59; *infra* pp.35-38. Plaintiffs

30

are not required to limit their suit to specific existing examples of digital asset transactions that fit that mold, any more than the plaintiffs in *Bear Creek* were required to limit their suit to particular employment practices or employees that might give rise to an unlawful EEOC enforcement action. *See Braidwood*, 70 F.4th at 926; *Bear Creek*, 571 F.Supp.3d at 597-98.  Nor is it problematic that Plaintiffs seek relief not only with respect to LEJILEX, but also with respect to similarly situated CFAT members.  The SEC does not dispute that CFAT has similarly situated members or that CFAT is "an appropriate representative of its members," and it is hardly remarkable that when an association "seeks a declaration, injunction, or some other form of prospective relief … the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 511, 515 (1975)).  That does not begin to convert every suit brought by an association seeking declaratory or injunctive relief against the government for the benefit of its members into an improper "programmatic challenge."  *Contra* Defts.MTD.23-24.

Finally, the SEC asserts that resolving Plaintiffs' claims would improperly "entangle this Court in [pending] enforcement actions," because the SEC has already sued some CFAT members for facilitating the same kind of secondary-market digital asset transactions at issue here. Defts.MTD.24.  But if anything, the fact that the SEC has already brought unlawful enforcement actions against other entities underscores that this case *is* "[]fit for judicial decision," *contra* Defts.MTD.24, as it confirms both that LEJILEX faces an imminent threat of an unlawful enforcement action if it engages in the same conduct, and that courts are fully capable of resolving whether such enforcements actions fall within the SEC's purview.  *See supra* p.8; *cf. Braidwood*, 70 F.4th at 926-28.  And to the extent there is any risk of "interference" with pending enforcement actions in other courts, Defts.MTD.24, that risk can easily be addressed by tailoring the eventual

remedy in this case to accommodate those interests.[5]   The existence of those pending actions accordingly cannot justify refusing to hear Plaintiffs' claims.

### E.        This Court Should Decide Plaintiffs' Claims.

Failing all else, the SEC asks this Court to simply "exercise its discretion to dismiss the complaint," relying on the "'nonobligatory nature'" of declaratory relief.  Defts.MSJ.22 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)).  That request fails at the threshold, because Plaintiffs do not seek only declaratory relief.  Plaintiffs also seek injunctive relief, *see* Compl. ¶¶5, 93, 94(e), asserting the traditional equitable cause of action "to enjoin unlawful executive action," *Armstrong*, 575 U.S. at 327, which falls squarely within this Court's "virtually unflagging obligation … to exercise [its] jurisdiction," *Colo. River*, 424 U.S. at 817.  This Court therefore cannot "dismiss the complaint" on discretionary grounds, *contra* Defts.MSJ.22; at most, any discretion it has would extend only to Plaintiffs' claims for declaratory relief.  The SEC ignores that problem entirely, and so gives no good reason for this Court to take that inefficient approach.

At any rate, the SEC's extraordinary request for discretionary dismissal fails on its own terms.  The SEC claims that "fairness and efficiency weigh in favor of dismissing [P]laintiffs' complaint" because (it says) it is "inefficient and improper" to allow Plaintiffs to bring a declaratory judgment action to determine the legality of their conduct in advance.  Defts.MSJ.23. That gets matters backwards.  The whole point of the Declaratory Judgment Act is to provide "an alternative to pursuit of the arguably illegal activity," so that a plaintiff need not "expose himself to liability before bringing suit to challenge the basis for the threat" of government enforcement. *MedImmune*, 549 U.S. at 129; *see, e.g.*, *Tex. Emps.' Ins. Ass'n v. Jackson*, 862 F.2d 491, 505 (5th

---

[5] To be clear, Plaintiffs do not seek to enjoin any SEC enforcement actions that were pending when Plaintiffs' complaint was filed and will stipulate to excluding any such actions from the declaratory and injunctive relief they have requested.

Cir. 1988) (declaratory judgment ensures that "[l]itigants would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril").  It is hardly inefficient or improper—let alone "forum shopping," Defts.MSJ.23 (quoting *Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 388 (5th Cir. 2003))—for Plaintiffs to use the declaratory judgment procedure for the precise purpose for which it is designed.[6]

The SEC complains that a declaratory judgment action unfairly forces it "to take a position regarding the legality of LEJILEX's planned operations."  Defts.MSJ.23.  But that complaint is one only a regulator could love; the citizen has a right to know whether proposed conduct is unlawful, and the regulator has no right to keep the citizen in suspense.  And in all events, that complaint rings hollow when the SEC has already made its position entirely clear by repeatedly bringing enforcement actions against other entities for engaging in the same conduct.  *See* Compl. ¶¶52-57; Pltfs.MSJ.15-18; App.3 (Wawszczak Decl. ¶12).  Under the SEC's view, courts ought to dismiss *every* declaratory judgment action against the government as "inefficient and improper," since the government could always claim that a plaintiff bringing a pre-enforcement suit is "circumventing [the] prosecutorial process" by not just engaging in the conduct and letting the government choose its own time and place to bring an enforcement action.  Defts.MSJ.23.  That plainly is not the law.  *See, e.g.*, *MedImmune*, 549 U.S. at 128-29; *Braidwood*, 70 F.4th at 926 (recognizing that "the purpose of the Declaratory Judgment Act is to settle 'actual controversies'

---

[6] The SEC notably does not suggest that Plaintiffs' choice of forum was in any way improper. *See* Compl. ¶¶7-9 (establishing venue in this district).  Instead, the only basis for its "forum shopping" accusation appears to be that Plaintiffs brought suit in advance to determine the legality of LEJILEX's intended conduct, rather than engaging in that conduct and then waiting for the SEC to bring an enforcement action in the forum of *its* choosing.  Defts.MSJ.23.

before they ripen into violations of law" (brackets omitted)).[7]  Moreover, the SEC conspicuously refuses to say that it thinks that the conduct LEJILEX has actually proposed would be legal.  It instead just professes uncertainty as to whether LEJILEX will really operate in the manner that LEJILEX has repeatedly attested it will.  If the SEC wants to test the credibility of those attestations, it is free to do so.  But the agency cannot secure dismissal—let alone summary judgment—by simply refusing to take unrefuted declarations at face value.

The SEC ends by reiterating its concern that allowing Plaintiffs' claims to proceed might interfere with proceedings in other courts.  Defts.MSJ.24; *see* Defts.MTD.24.  That argument fails for all the reasons already noted, as any relief this Court may ultimately provide could easily be cabined to avoid intruding on any prior pending actions.  *See supra* pp.31-32 & n.5.  In any event, the SEC can hardly argue that this Court should decline to consider whether a threatened enforcement action is unlawful just because the SEC has brought similar enforcement actions in the past, especially when that is the very thing that creates a credible fear of future enforcement against Plaintiffs.  *See Braidwood*, 70 F.4th at 926-28; *Bear Creek*, 571 F.Supp.3d at 595-96; *supra* pp.8-9.  The SEC thus identifies no basis for this Court to decline to exercise the jurisdiction that it plainly has.

---

[7] None of the SEC's cases suggests otherwise.  *See Agri-Trans Corp. v. Gladders Barge Line, Inc.*, 721 F.2d 1005, 1010-11 (5th Cir. 1983) (plaintiff could not obtain judicial review of an administrative determination before the agency made that determination, as there "is nothing for the courts to review"); *Groos Nat'l Bank v. Comptroller of Currency*, 573 F.2d 889, 894-95 (5th Cir. 1978) (banking statute withdrew jurisdiction over a declaratory judgment action that would conflict with its "detailed framework for regulatory enforcement"); *Tex. Med. Ass'n v. Aetna Life Ins. Co.*, 80 F.3d 153, 158-59 (5th Cir. 1996) (state regulations that provided specific remedies for their breach could not be privately enforced through a declaratory judgment action).

## II.   The SEC Has No Statutory Authority To Regulate The Digital Asset Transactions That Will Occur On LEJILEX's Platform.

When the SEC finally gets around to the question at the core of this case—whether Congress has authorized it to regulate the digital asset transactions that will occur on LEJILEX's platform—it has remarkably little to say.  Rather than confront the arguments Plaintiffs have actually made, the SEC expends most of its effort attacking a straw man, pretending that Plaintiffs claim that *all* "digital-asset transactions cannot be securities transactions regardless of the circumstances."  Defts.MSJ.12.  But as Plaintiffs have made abundantly clear (and as the SEC is eventually forced to acknowledge, *see* Defts.MSJ.18), that is not Plaintiffs' position.  On the contrary, Plaintiffs have explicitly acknowledged from the outset that digital asset transactions *could* involve the kind of stake in an ongoing enterprise that is required to create an investment contract.  *See, e.g.*, Compl. ¶¶39, 59, 64; Pltfs.MSJ.8-9, 20, 31; App.2 (Wawszczak Decl. ¶7). Plaintiffs' position is simply that the bare purchase and sale of digital assets that do *not* carry with them any such stake—which are the only kind of transactions LEJILEX will facilitate, *see* App.2 (Wawszczak Decl. ¶7), and the only kinds of transactions as to which Plaintiffs seek relief, *see* Compl. ¶94(a)—are not securities transactions, and so are not subject to SEC oversight.  On *that* issue, which is the only one actually presented here, the SEC has relatively little to say, and none of it is persuasive.

### A.   Digital Asset Transactions on LEJILEX's Platform Will Contain None of the Essential Characteristics of an Investment Contract.

The SEC does not dispute that its only conceivable basis for asserting jurisdiction over the digital asset transactions that will occur on LEJILEX's platform is to claim that those transactions involve "investment contracts."   Defts.MSJ.12-13; *see* 15 U.S.C. §§77b(a)(1), 78c(a)(10) (defining "security" to include "investment contract"); Pltfs.MSJ.22.  Nor does it dispute that, under settled law, an "investment contract" must involve a traditional investment relationship—

35

that is, "the placing of capital or laying out of money in a way intended to secure income or profit from its employment," in which the investor contributes capital to a common enterprise and the seller or a third party agrees in exchange to manage that enterprise and share its profits. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). As the statutory text, history, and precedent confirm, absent that kind of "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party," there is no investment contract. *Id.* at 298-99; *see SEC v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) (investment contract requires "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor"); Pltfs.MSJ.24-31; Dkt.53-1 ("Digital Chamber Amicus Br.") at 2-8.

The digital asset transactions at issue here are nothing like the investment contracts that Congress has authorized the SEC to regulate. While it is certainly possible to create digital assets that embody the kind of investor/investee relationship necessary for an investment contract—for instance, if a company were to issue a digital asset representing a traditional share of stock in that company—LEJILEX will not permit transactions in any such digital assets on its platform. App.2 (Wawszczak Decl. ¶7). Instead, the digital asset transactions that will occur on the Legit.Exchange will consist only of bare asset purchases and sales, with no accompanying obligation by the seller or the asset's creator to use any portion of the purchase price to generate profits in which the purchaser is entitled to share. App.2 (Wawszczak Decl. ¶7).

Those transactions—like buying and selling any other assets in any other market—accordingly do not give rise to any investment contract or constitute securities transactions under the federal securities laws. *See* Dkt.48-1 ("Paradigm Amicus Br.") at 2-9 (describing the manifold differences between standalone digital assets and securities). Buying a standalone digital asset is

not an "investment of money" in whatever entity created that asset, *Arcturus*, 928 F.3d at 409, just as buying a pair of sneakers is not an investment in Nike, and buying a baseball card is not an investment in The Topps Company.  Those transactions transfer only ownership of the asset itself, not participation in any "common enterprise" with its seller or creator.  *Id.*  And any "profit" the buyer seeks to realize on those transactions must come from its own efforts—such as by reselling the purchased asset to another buyer at a higher price—rather than being "derived solely from the efforts of individuals other than the investor."  *Id.*; *see* Pltfs.MSJ.31-32.  To be sure, the buyer of a digital asset, just like the buyer of many other assets, may well hope to turn an eventual profit on that purchase, and may even view that purchase in colloquial terms as an "investment."  But that does not transform the bare purchase of a standalone asset into an "investment contract" subject to SEC regulation under the securities laws.  *See* Pltfs.MSJ.34-36;  Dkt.50 ("States Amicus Br.") at 14-19.

That is especially clear with respect to secondary transactions in digital assets—the only kind of transactions the Legit.Exchange will facilitate, *see* App.2-3 (Wawszczak Decl. ¶¶4, 7, 9). Those transactions simply transfer ownership of an existing digital asset from one party to another, without any involvement by the asset creator or any ongoing undertaking by the asset creator (or anyone else) to devote the purchase price to managing any common enterprise for the buyer's benefit or to share any resulting profits.  Indeed, in the blind bid/ask secondary-market transactions that LEJILEX's platform will facilitate, a digital asset buyer will not even know who the seller is—making it impossible to expect any kind of ongoing investment relationship with or future profits from the seller's efforts.  App.2 (Wawszczak Decl. ¶5); *see SEC v. Ripple Labs, Inc.*, 682 F.Supp.3d 308, 329 (S.D.N.Y. 2023) (finding no investment contract where buyer "did not know to whom or what it was paying its money").  Neither *Howey* nor any subsequent Supreme Court

case applying it has ever found an investment contract under any comparable circumstances, and for good reason: The securities laws are designed to regulate those who offer traditional *investment* opportunities, not to transform secondary-market asset sales into securities transactions subject to SEC regulation even when they involve no ongoing obligations at all.

If any doubt remained, the major questions doctrine would resolve it. Nothing in the 90-year-old statutory term "investment contract" clearly authorizes the SEC's novel attempt to dramatically expand its regulatory power to cover standalone asset sales that involve no ongoing obligations or participation in any profit-sharing enterprise—an approach that would give the SEC control over not only the trillion-dollar digital asset industry, but countless other asset sales that have never been understood to be securities transactions. Whether the SEC should have such sweeping power is unquestionably an issue of "vast 'economic and political significance,'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), and to recognize such a power at this late date would effect a "fundamental revision" and "transformative expansion in [the SEC's] regulatory authority," *West Virginia v. EPA*, 597 U.S. 697, 724, 728 (2022). That power thus cannot be afforded to the SEC absent clear statutory text granting it—especially when Congress is actively debating how digital assets should be regulated and has repeatedly declined to grant the SEC the power it now claims to have had all along, *see* Pltfs.MSJ.46-47, and when the SEC's regulatory framework does not even make any sense when applied to digital assets, *see* Paradigm Amicus Br.9-16. In short, all the "indicators from [the Supreme Court's] major questions cases," *Biden v. Nebraska*, 143 S.Ct. 2355, 2374 (2023), confirm that the decades-old statutory term "investment contract" cannot be read to grant the SEC the radical new power over standalone asset sales that it now claims. *See* Pltfs.MSJ.43-48; States Amicus Br.10-13; Digital Chamber Amicus Br.20-24.

**B.      The SEC's Attempts to Evade Any Limit on Its Authority Are Unavailing.**

1. The SEC resists that conclusion, insisting that "Supreme Court precedent" dictates that a standalone digital asset sale "*can* be a securities transaction" even if it involves no ongoing obligation on the part of the asset seller or creator to manage a common profit-sharing enterprise for the buyer's benefit.  Defts.MSJ.19 (emphasis added).  In fact, Supreme Court precedent confirms the opposite, as every arrangement the Court has ever identified as an investment contract has involved some kind of ongoing reciprocal relationship in which the seller undertook to manage a common enterprise to generate returns to be shared with investors.  *See* Pltfs.MSJ.28-29 (citing cases).  That is unsurprising:  As Plaintiffs' summary judgment motion details, *see* Pltfs.MSJ.22-48, the *sine qua non* of an investment contract is an investor/investee relationship, which requires "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *Howey*, 328 U.S. at 298.  That core feature does not exist in a bare asset sale in which the buyer acquires nothing but title to the asset, with no accompanying obligation on the part of the seller or any third party to put the purchase price to work for the buyer's benefit and share any resulting profits.  Otherwise, every asset sale would be a securities transaction, and the SEC's authority would be boundless.  *See* Pltfs.MSJ.43-48.[8]

---

[8] As Defendants implicitly concede, that core requirement of an ongoing investment relationship applies equally to both primary and secondary transactions.  *See* Pltfs.MSJ.31-32; *cf.* Defts.MSJ.21 (acknowledging that *Howey* "does not recognize" a distinction between primary and secondary transactions "in its test of whether a transaction constitutes an investment contract" (quoting *SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *23 (S.D.N.Y. Mar. 27, 2024)).  And as already explained, the absence of that necessary relationship in a bare digital asset sale is all the more evident in the secondary-market context, where there is normally no involvement whatsoever on the part of the asset's creator, let alone any obligation on the part of the creator to manage any common enterprise for the buyer's benefit.  *See* Pltfs.MSJ.32-34; *supra* pp.35-38; *contra* Defts.MSJ.21-22.

*Howey* itself forecloses Defendants' contrary claim.  There, promoters offered investors "both a land sales contract and a service contract"; the land sales contract allowed investors to buy plots of land planted with orange trees, while the service contract provided that the promoters would cultivate, harvest, and market the oranges from the entire grove and share the profits *pro rata* among the investors.  328 U.S. at 295-96.  There was never any question that the second contract was essential to any claim that the arrangement constituted an investment contract.  The only question before the Court was whether it made a difference that the promoters were offering two "separate transactions" since, as the Court explained, neither "an ordinary real estate sale" nor "an agreement by the seller to manage the property" standing alone would qualify as an investment contract.  *Id.* at 297-98.  But the Court declined to focus only on "[f]orm," and instead looked to the "economic reality" of what the promoters were offering.  *Id.* at 298.  And by offering the two contracts as a joint package, the promoters were offering "something more than fee simple interests in land, something different from a farm or orchard coupled with management services"; they offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise."  *Id.* at 299.  That kind of arrangement, in which "[t]he investors provide the capital and share in the earnings and profits" while "the promoters manage, control and operate the enterprise," is precisely what the term "investment contract" is designed to cover.  *Id.* at 300.

Seizing on the fact that "only some" purchasers "entered into" the "separate service contracts" that the promoters offered, the SEC insists that whether the promoters had any ongoing obligation to manage a common enterprise was "'incidental'" to whether the parties entered into investment contracts.  Defts.MSJ.20.  In fact, *Howey* says the opposite.  As the Court explained, the reason it made no difference that not all purchasers opted for both the land and the service contract is because "[t]he Securities Act prohibits the *offer* as well as the sale of unregistered,

40

nonexempt securities." 328 U.S. at 301 (emphasis added).  So the promoters violated the Act by offering the combination of the two, regardless of whether "some purchasers chose not to *accept* the full offer of an investment contract by declining to enter into a service contract." *Id.* at 300-01 (emphasis added).  But as that language makes abundantly clear, the promoters did *not* enter into "investment contracts" with purchasers who declined the service contract—because without the service contract, there was no "investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.  *Howey* thus unequivocally confirms that an ongoing obligation to manage a common profit-sharing enterprise for the buyer's benefit is the *sine qua non* of an investment contract.

SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)—which pre-dated *Howey* by three years—does not suggest otherwise. *Contra* Defts.MSJ.19-20. *Joiner* involved "a campaign to sell assignments of oil leases" in which the underlying leases "were granted by the land owners on an agreement that a test well would be drilled by the lessees." *Id.* at 345-46.  The Court concluded that those transactions constituted "a form of investment contract in which the purchaser was paying both for a lease and for a development project," as the sellers "made a contract in which payments were timed and contingent upon completion of the well." *Id.* at 349.  To be sure, the Court found it "unnecessary to determine" whether the investors who bought the assignments "acquired a legal right to compel the drilling of the test well" under state law. *Id.*  But that is not because the Court deemed it irrelevant whether the seller undertook any such obligation.  It is because the securities laws are concerned with whether the kinds of ongoing obligations that give

rise to an investment contract *exist*, not with what remedies may be available under state law to enforce those obligations should the seller breach them.[9]

With no support in Supreme Court precedent, the SEC turns to recent non-binding out-of-circuit district court decisions in enforcement actions it has brought against other digital asset industry participants. Defts.MSJ.20-21 (citing *Coinbase*, 2024 WL 1304037, at *19, 23-24; *SEC v. Terraform Labs Pte. Ltd.*, 684 F.Supp.3d 170, 193 (S.D.N.Y. 2023)). But while those decisions indicate that there need not be a "technically valid written or oral contract under state law" for a transaction to qualify as an investment contract, *Terraform*, 684 F.Supp.3d at 193; *see, e.g.*, *Coinbase*, 2024 WL 1304037, at *19 (same), that hardly means that there does not need to be an *investment* relationship between the parties—i.e., a relationship in which the promoter or a third party promises to manage a common enterprise for the investors' benefit and share the resulting profits. *See* Pltfs.MSJ.42-43. And to the extent those decisions suggested that a buyer's "expectations and understandings" that she will be able to sell an asset for a profit can convert a bare asset sale into an investment contract, *Coinbase*, 2024 WL 1304037, at *25, they are mistaken and this Court should decline to follow them, as to accept that proposition would eviscerate the core requirement that sets an investment contract apart from other transactions—namely, an ongoing obligation to manage a common profit-sharing enterprise for the purchaser's benefit. *See* Pltfs.MSJ.42-43. Because that core requirement is lacking from the only digital asset transactions at issue here, they are not investment contracts, and the SEC has no statutory authority to regulate them under the federal securities laws.

---

[9] The SEC's citation of *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985), is even more misplaced. That case involved sales of certificates of deposit, which unquestionably involved ongoing obligations to pay the investors the returns that the certificates of deposit promised. *See id.* at 232, 234.

2. Unable to refute Plaintiffs' arguments, the SEC once again resorts to mischaracterizing them, claiming that Plaintiffs insist that "digital-asset transactions cannot be securities transactions regardless of the circumstances."  Defts.MSJ.12; *see also, e.g.*, Defts.MSJ.14, 17.  Again, that is wildly inaccurate.  As Plaintiffs have made clear from the initiation of this suit (and the SEC eventually acknowledges, *see* Defts.MSJ.18), they do not contend that "no digital-asset transaction—no matter the facts and circumstances—can be a securities transaction." Defts.MSJ.17.  On the contrary, Plaintiffs have repeatedly acknowledged that "it is certainly *possible* for a digital asset to involve ongoing obligations running from the asset's creator to those who purchase it" that could make the purchase or sale of that digital asset a securities transaction. Compl.  ¶39; *see also, e.g.* Compl. ¶59 (recognizing that digital assets can be "structured akin to a traditional share or stock and carry with them an ongoing commitment on the part of the asset seller or developer (or a third party) to manage a common venture for the asset buyer's benefit"); Pltfs.MSJ.8-9, 20, 31; App.2 (Wawszczak Decl. ¶7) (recognizing that "some rare digital assets … may represent shares in a common profit-sharing enterprise and carry with them ongoing obligations on the part of their creator toward their purchasers").  But as Plaintiffs have likewise made clear since the outset, this case does not involve any such digital assets, because LEJILEX "will not permit trading" on the Legit.Exchange in any digital assets that carry with them any such obligations on the issuer's part.  Compl. ¶59; *see also* App.2 (Wawszczak Decl. ¶7).

The SEC contends that it is impossible to determine whether the digital asset transactions that the Legit.Exchange will facilitate will be securities transactions because answering that question "requires a facts-and-circumstances analysis that turns on the features of the transactions," Defts.MSJ.12, and it maintains that it cannot discern enough detail because the complaint "does not identify specific digital assets," transactions, or trading platforms other than

the Legit.Exchange.  Defts.MSJ.17-18.  Those charges are baffling.  There is no mystery as to what transactions on the Legit.Exchange will look like.  Plaintiffs have identified numerous specific digital assets to illustrate exactly what kinds of assets will be available for trading, *see* Compl. ¶¶61, 88; App.3 (Wawszczak Decl. ¶8), and they have illustrated exactly how transactions on the exchange will work (including by identifying comparable platforms), *see* Compl. ¶¶58-62; App.2-3 (Wawszczak Decl. ¶¶4-12).  The SEC does not contend that it needs to examine each and every transaction in those assets when they are traded on *other* exchanges to determine whether the securities laws are implicated.  To the contrary, the central premise of its enforcement actions against Coinbase, Binance, Kraken, and other platforms is that *all* transactions in those assets are securities transactions simply because of the nature of the assets.  *See* Compl. ¶¶87-88; App.3 (Wawszczak Decl. ¶¶8, 12).  The SEC cannot insist that it needs to know all manner of "facts and circumstances" to defend against a pre-enforcement challenge when it is happy to pursue enforcement actions without those details.

In short, there is nothing "conclusory," let alone "*ipse dixit*," about Plaintiffs' allegations. *Contra* Defts.MSJ.18.  LEJILEX intends to engage only in conduct that is identical in all material respects to conduct that the SEC itself has insisted in enforcement action after enforcement action is *categorically* covered by the securities laws.  Whether the securities laws may apply to entirely different types of transactions involving entirely different types of digital assets is neither here nor there.  The only question this Court needs to answer is whether they apply to the only types of transactions that LEJILEX *does* wish to facilitate, and the only types of transactions as to which Plaintiffs have sought relief—namely, secondary transactions in digital assets that no one has ever claimed carry with them any ongoing obligations to manage a common profit-sharing enterprise for their purchasers' benefit.  The SEC has been insisting for the past several years that it does not

matter if digital assets entail any such ongoing obligations; in its view, it is enough that people may purchase them with the hope or expectation of turning a profit.  And when push comes to shove, the SEC continues to take that position here.  *See, e.g.*, Defts.MSJ.19 ("[A] digital-asset transaction can be a securities transaction even absent such an 'ongoing obligation.'").  The SEC cannot escape defending that position by feigning confusion as to what everyone knows this case is really about.

## CONCLUSION

This Court should deny Defendants' motions to dismiss and for summary judgment and grant Plaintiffs' motion for summary judgment.

Dated: August 28, 2024                        Respectfully submitted,

                                              /s/ Randy D. Gordon
                                              Randy D. Gordon
                                              Texas State Bar No. 00797838
                                              RDGordon@duanemorris.com
                                              John S. Polzer
                                              Texas State Bar No. 24042609
                                              JSPolzer@duanemorris.com
                                              Roger C. Diseker
                                              Texas State Bar. No. 00787371
                                              RDiseker@duanemorris.com
                                              Christopher A. Brown
                                              Texas State Bar No. 24086265
                                              CABrown@duanemorris.com
                                              Joakim G. Soederbaum
                                              Texas State Bar No. 24091338
                                              JSoederbaum@duanemorris.com
                                              DUANE MORRIS LLP
                                              777 Main Street, Suite 2790
                                              Fort Worth, TX 76102
                                              Tel: (817) 704-1000
                                              Fax: (817) 704-1001


                                              Paul D. Clement (admitted *pro hac vice*)
                                              paul.clement@clementmurphy.com
                                              Erin E. Murphy (admitted *pro hac vice*)
                                              erin.murphy@clementmurphy.com
                                              C. Harker Rhodes IV (admitted *pro hac vice*)
                                              harker.rhodes@clementmurphy.com
                                              Nicholas M. Gallagher (admitted *pro hac vice*)*
                                              nicholas.gallagher@clementmurphy.com
                                              CLEMENT & MURPHY, PLLC
                                              706 Duke Street
                                              Alexandria, VA 22314
                                              Tel: (202) 742-8900
                                              *Supervised by principals of the firm who are members of
                                              the Virginia Bar


                                              *Counsel for Plaintiffs*